In The


Court of Appeals


Sixth Appellate District of Texas at Texarkana



______________________________



No. 06-08-00007-CV


______________________________





THE STATE OF TEXAS FOR THE BEST INTEREST 


AND PROTECTION OF J. T.






 


On Appeal from the County Court at Law


Cherokee County, Texas


Trial Court No. 35,695




 




Before Morriss, C.J., Carter and Moseley, JJ.


Memorandum Opinion by Justice Carter



MEMORANDUM OPINION



 J.T. appeals the trial court's order authorizing extended mental health services pursuant to
Section  574.035  of  the  Texas  Health  and  Safety  Code.  See  Tex.  Health  &  Safety  Code
Ann. § 574.035 (Vernon Supp. 2007). (1) On appeal, J.T. contends that the trial court erred by
admitting evidence that he had been receiving mental health services for the past six years and that
the evidence is legally and factually insufficient to support the finding required to uphold the trial
court's order. We will affirm.

I. FACTUAL AND PROCEDURAL BACKGROUND

 J.T. was first committed to Rusk State Hospital in 2001 when it was discovered that he built
a guillotine and intended to kill himself because he bore the "mark of the beast." When, in
November 2007, the State filed its latest application to extend mental health services, J.T. requested
a jury trial to determine whether he should continue to receive court-ordered mental health services.

 Dr. Victoria Morgan, M.D., completed one of the required certificates of medical
examination and has been J.T.'s treating physician since June 2007. Dr. Morgan reviewed his
medical history, and her testimony detailed occurrences during J.T.'s stay at the hospital and her own
observations as J.T.'s treating physician. She described J.T.'s suicide attempt in July 2005 in which
he attempted to hang himself in his bathroom the day after he had been approved for a lower
observation status. J.T. has not had another suicide attempt since the hospital put him back on a
higher observation status. (2) J.T. attends his treatment meetings with doctors, but refuses to answer
certain questions. Particularly, he always answers "No comment" when asked during his treatment
meetings if he wants to hurt himself or has plans to do so. Dr. Morgan described how certain
components of J.T.'s disorder have become more severe in the few months prior to the hearing. He
frequently writes very detailed letters to document perceived injustices, including letters to the
hospital administration and the FBI. Dr. Morgan also testified about J.T.'s tendency to go without
food or fluids in response to perceived abuses of authority. Dr. Sethurama Srinivasan, J.T.'s former
treating physician, also testified that J.T. suffered from delusional disorder and detailed J.T.'s 2005
suicide attempt. He completed the second required certificate of medical examination. 

 Carol Norbell, a social worker and member of J.T.'s treatment team, testified that her
interaction with J.T. is largely pleasant, but J.T. is unwilling to disclose how he is doing and feeling. 
She explained that J.T. would not talk to her about his sleeping patterns, family-related issues, and
whether or not he heard voices. In July 2007, J.T.'s treatment team held a meeting in which it
considered J.T.'s request to be placed on a lower observation status. During that meeting, J.T.
requested to read a passage from the Bible and referred to the "mark of the beast," which Norbell
described as reminiscent of J.T.'s suicidal ideations from his initial hospitalization.

 Sylvia Middlebrook, a staff psychologist, confirmed that J.T. refuses to answer most
questions, even those that Middlebrook characterizes as innocuous questions regarding sleep and
appetite. Based on her review of his medical records and her observations of him, Middlebrook
concurred with the diagnosis of delusional disorder and with Dr. Morgan's assessment that J.T. is
at risk to harm himself. In particular, she cited his refusal to eat and drink and his refusal, when
asked, to give the treatment team any assurance that he will not harm himself. She conceded it is
difficult to know the extent of any other disorders, if any, because of J.T.'s refusal to answer
questions. 

II. APPLICABLE LAW 

 Orders for extended mental health services are governed by the following provision:

 (a) The judge may order a proposed patient to receive court-ordered extended
inpatient mental health services only if the jury, or the judge if the right to a jury is
waived, finds, from clear and convincing evidence, that:

 

 (1) the proposed patient is mentally ill;

 

 (2) as a result of that mental illness the proposed patient:

 

 (A) is likely to cause serious harm to himself;

 

 (B) is likely to cause serious harm to others; or

 

 (C) is:


 (i) suffering severe and abnormal mental, emotional, or physical
distress;

 

 (ii) experiencing substantial mental or physical deterioration of the
proposed patient's ability to function independently, which is
exhibited by the proposed patient's inability, except for reasons of
indigence, to provide for the proposed patient's basic needs, including
food, clothing, health, or safety; and

 

 (iii) unable to make a rational and informed decision as to whether or
not to submit to treatment;

 

 (3) the proposed patient's condition is expected to continue for more than 90
days; and

 

 (4) the proposed patient has received court-ordered inpatient mental health
services under this subtitle or under Chapter 46B, Code of Criminal Procedure, for
at least 60 consecutive days during the preceding 12 months.

Tex. Health & Safety Code Ann. § 574.035. When, as in this case, the proposed patient has
already been subject to an order for extended mental health services, the jury is not required to make
the fourth finding as set out in the statute. Tex. Health & Safety Code Ann. § 574.035(a)(4), (d). 
If the judge or jury finds that the proposed patient meets the prescribed commitment criteria, the
judge or jury must specify which criterion forms the basis of the decision. Tex. Health & Safety
Code Ann. § 574.035(c); Martin v. State, 222 S.W.3d 532, 535 (Tex. App.--Houston [14th Dist.]
2007, pet. denied).

 Clear and convincing evidence is that measure or degree of proof that will produce in the
mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be
established. Tex. Civ. Prac. & Rem. Code Ann. § 41.001(2) (Vernon Supp. 2007); State v.
Addington, 588 S.W.2d 569, 570 (Tex. 1979). To be clear and convincing under Section 574.035(a),
the evidence must include expert testimony and evidence of a recent overt act or a continuing pattern
of behavior that tends to confirm (1) the likelihood of serious harm to the proposed patient or others
or (2) the proposed patient's distress and the deterioration of the proposed patient's ability to
function. Tex. Health & Safety Code Ann. § 574.035(e). The overt act or continuing pattern of
behavior "must relate to the criterion on which the judgment is based." See In re F.M., 183 S.W.3d
489, 492 (Tex. App.--Houston [14th Dist.] 2005, no pet.); J.M. v. State, 178 S.W.3d 185, 193 (Tex.
App.--Houston [1st Dist.] 2005, no pet.).

III. ADMISSION OF EVIDENCE

 In his first point of error, J.T. complains that the trial court abused its discretion by admitting
evidence that referred to prior commitments to Rusk State Hospital and the alleged acts surrounding
those commitments. Evidence is relevant if it has any tendency to make any fact that is of
consequence to the determination of the action more probable or less probable than it would be
without the evidence. Tex. R. Evid. 401. J.T. maintains the probative value of this evidence is
substantially outweighed by the danger of unfair prejudice or confusion of the issues by the jury. See 
Tex. R. Evid. 403. J.T. points out that a juror interrupted Dr. Morgan's testimony with the question
"Has he been in the hospital since 2001?" J.T. contends that this spontaneous question from the
juror demonstrates the impact that the evidence had on the jury.

 We review a trial court's evidentiary ruling for an abuse of discretion. Campbell v. State, 118
S.W.3d 788, 795 (Tex. App.--Houston [14th Dist.] 2003, pet. denied). When faced with a similar
argument, the Houston-Fourteenth Court disagreed that the patient's prior violent acts were not
relevant to the jury's assessment of the Section 574.035 factors:

 The state of an individual's emotional and psychological well-being--or lack
thereof--and whether the person should remain committed because of a mental
illness, requires more than a snapshot of a single year in a person's life; it is a broad
inquiry. In an involuntary commitment case, we ask whether the person is mentally
ill and needs help (1) to protect himself or others or (2) to maintain his health. 
Especially when a person was criminally violent while insane and has been
committed for years, focusing only on the most recent years of life provides no frame
of reference. To determine if one who has been mentally ill is now well, or at least
able to protect others and maintain his health, a psychological history is necessary.

Id. at 796. Of course, the precise nature of the evidence in Campbell is somewhat different than the
evidence at issue here. We recognize, though, that a similar perspective applies here. Here, we are
called upon specifically to examine the record for a recent overt act or a continuing pattern of
behavior. That said, we must look at what J.T. has done in the past. Inevitably, since J.T. was, in
fact, in the state hospital, evidence relevant to a continuing pattern of his behavior will refer to the
fact that J.T. was in the state hospital. We note that the State presented evidence relating to J.T.'s
condition and behavior rather than simply taking the position that J.T. should be involuntarily
committed this time because he has been committed in the past.

 We also note that, in certain circumstances, a judge or jury must find that the proposed
patient has received court-ordered inpatient mental health services for at least sixty consecutive days
during the preceding twelve months. See Tex. Health & Safety Code Ann. § 574.035(a)(4). 
Section 574.035(d) eliminates the need for this finding when, as here, the proposed patient already
has been subject to an order for extended mental health services. By creating such an exception,
Section 574.035 contemplates the admission of evidence relating to prior orders authorizing
extended mental health services. The evidence in question is relevant.

 We must now consider whether this evidence, though relevant, should be excluded because
it was unfairly prejudicial. Under Rule 403, relevant evidence may be excluded if its probative value
is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading
the jury. Tex. R. Evid. 403. To properly apply Rule 403 to relevant evidence, the trial court must
balance and weigh the probative effect of the evidence against its potential for unfair prejudice or
confusion. In re C.J.F., 134 S.W.3d 343, 356 (Tex. App.--Amarillo 2003, pet. denied). In weighing
the probative value of the evidence against the danger of unfair prejudice, the court must first
examine the necessity for and probative effect of the evidence. Id. As we have concluded, evidence
referring to J.T.'s prior commitments is relevant to the issues the jury must examine, and any risk of
unfair prejudice must be measured against this relatively high degree of relevance. See Campbell,
118 S.W.3d at 798. Unfair prejudice means an "undue tendency to suggest decision on an improper
basis, commonly, though not necessarily, an emotional one." Montgomery v. State, 810 S.W.2d 372,
378 (Tex. Crim. App. 1990). 

 The record here suggests the jury carefully considered the evidence for over an hour and
arrived at its verdict based on the evidence presented and not on an improper basis. We observe, and
will detail further in response to J.T.'s next point of error, that the jury had a great deal of evidence
on which it could have found the State satisfied the statutory criteria. Further, the State did not focus
on the fact that J.T. had been at Rusk State Hospital since 2001; it did not rely on that aspect of the
evidence to support its application. The fact that he was in the hospital, as we have stated, is
incidental to and almost inseparable from the evidence regarding J.T.'s behavior and mental
condition. 

 After a witness testified to J.T.'s initial hospital admission, a juror asked a question regarding
J.T.'s hospitalization since 2001. The trial court responded to the juror's question in a swift manner
that was clear and concise, but did not emphasize the matter: 

 THE COURT: Time out. Yes, ma'am?

 JUROR: Has he been in the hospital since 2001?

 THE COURT: Let the lawyers speak to that. Okay?

 JUROR: I'm sorry.

 THE COURT: The lawyer will address all of the evidence.

 JUROR: Oh.

 THE COURT: Okay.

Of course, we cannot determine from the record the inflection with which the juror asked the
question, whether the juror expressed shock or whether she was simply asking the question as a
means of satisfying her own curiosity. The record does suggest that the question was not a
spontaneous exclamation since the juror had somehow gained the trial court's attention prior to
asking the question. Beyond that, the record provides us little information about the illocutionary
force of the question. J.T. suggests that the asking of this question demonstrates that the probative
value of the evidence, which we find to be high, was substantially outweighed by its prejudicial
effect. We do not arrive at such a conclusion. Considering the nature of the findings a jury must
make in this type of case, the exception created by Section 574.035(d), the state of the evidence, and
the trial court's response to the juror's question, we conclude that the trial court did not abuse its
discretion in allowing evidence that referred to the fact that J.T. has been committed since 2001. 

IV. SUFFICIENCY OF THE EVIDENCE

 The order for extended mental health services states the jury found, by clear and convincing
evidence, that J.T. is mentally ill, that as a result of his mental illness, he is likely to cause serious
harm to himself, and that he is suffering severe and abnormal mental, emotional, or physical distress;
that J.T. is experiencing substantial mental or physical deterioration of his ability to function
independently which is exhibited by his inability, except for reasons of indigence, to provide for his
basic needs, including food, clothing, health, or safety; and that he is unable to make a rational and
informed decision as to whether or not to submit to treatment. (3) 

 A. Standards of Review

 In reviewing the legal sufficiency of the evidence where the burden of proof is clear and
convincing evidence, we consider all of the evidence in the light most favorable to the finding to
determine whether a reasonable trier of fact could have formed a firm belief or conviction that its
findings were true. In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). We must assume that the trier
of fact resolved disputed facts in favor of its finding if a reasonable trier of fact could do so, and we
must disregard all contrary evidence that a reasonable trier of fact could have disbelieved or found
to be incredible. Id.

 In reviewing factual sufficiency challenges, we review all the evidence in the record, both
supporting and opposing the trial court's findings. In re C.H., 89 S.W.3d 17, 27-29 (Tex. 2002). 
We must give due consideration to evidence the trier of fact could reasonably have found to be clear
and convincing. Id. at 25. Under the clear-and-convincing standard, we determine whether the
evidence is such that the trier of fact could reasonably form "a firm belief or conviction" as to the
truth of the allegations sought to be established by the State. Id. We must consider whether disputed
evidence is such that a reasonable trier of fact could not have reconciled that disputed evidence in
favor of its finding. J.F.C., 96 S.W.3d at 266.

 



 B. Evidence of Mental Illness

 At the outset, we note that J.T. does not challenge the sufficiency of the evidence that his
condition is expected to continue for more than ninety days. See Tex. Health & Safety Code
Ann. § 574.035(a)(3). In support of his contention that the evidence is insufficient to support the
jury's finding that he is mentally ill, (4) J.T. points to the inconsistency between Dr. Srinivasan's
testimony and the evidence of mental illness found in Dr. Morgan's testimony and both medical
certificates. J.T. also contends that the limited contact between Dr. Morgan and J.T. would not
permit her to form a basis for her opinion that J.T. suffers from a mental illness. (5) 

 In their respective certificates of medical examination, Drs. Morgan and Srinivasan
diagnosed J.T. as having "delusional disorder." Dr. Morgan testified that she diagnosed J.T. as
suffering from a delusional disorder, mixed type. She explained that J.T.'s diagnosis includes the
"mixed type" notation because his delusional disorder has two key components: persecutory type
which involves paranoia, and grandiose type which can be of a religious context. To further explain
her diagnosis of grandiose component, she explained that J.T. told the staff in 2001 that he had the
"mark of the beast" and continues to tell the staff that he bears such mark. 

 Dr. Srinivasan treated J.T. from 2003 to 2006. He testified that he initially diagnosed J.T.
as schizophrenic when J.T. first came to the hospital. He concurs with the more recent diagnosis of
delusional disorder. According to the doctor, J.T.'s condition is worsening. He explained the
difficulty he had when examining an agitated J.T. who was constantly taking notes during the
examination:

 All that I could say was that he was psychotic. And to say that he has a delusional
disorder, he needs to tell me something. But at this time he did not talk to me, and
so I did not, you know, figure out any kind of delusions. But in the past, he had told
me all kinds of delusions. So, I can only say that he is getting worse than what he
was a couple of years ago.

Based on her review of J.T.'s history and her observations, psychologist Middlebrook concurred with
the diagnosis of delusional disorder and explained that it is difficult to know the extent of any other
disorders from which J.T. may be suffering, if any, because J.T. refuses to answer most questions. 
 Although the doctors did agree as to the difficulty in diagnosing J.T. when he refuses to
answer questions, they did provide a diagnosis and factual bases supporting their diagnoses. Their
testimony pointed to current behavior and observations and to medical history as a basis for the
diagnosis of delusional disorder. Having considered all of the evidence in a light most favorable to
the jury's finding, we conclude that the evidence is legally sufficient to support the jury's finding that
J.T. is mentally ill. Also, giving due consideration to evidence the jury could have found to be clear
and convincing, we conclude that factually sufficient evidence supports the jury's finding that J.T.
is mentally ill.

 C. Evidence of a Continuing Pattern of Posing a Risk of Harm to Himself

 J.T. correctly directs us to authority that, even if the evidence of mental illness is sufficient,
such evidence alone is insufficient to satisfy the statutory elements of Section 574.035. See L.S. v.
State, 867 S.W.2d 838, 867 (Tex. App.--Austin 1993, no writ). Since evidence of mental illness
alone is insufficient to justify involuntary commitment, we look to evidence that supports the other
challenged elements of Section 574.035. Specifically, J.T. contends the evidence is insufficient to
show an overt act or continuing pattern of behavior that would support a finding that he poses a risk
of harm to himself under Section 574.035(a)(2)(A) and the multi-faceted finding under Section
574.035(a)(2)(C). (6)

 1. "Mark of the Beast" and Suicidal Notions

 In much the same way as the doctors explained that J.T.'s reluctance to cooperate impacted
their ability to diagnose him, the doctors also expressed frustration in trying to learn whether J.T. still
entertained thoughts of suicide. Dr. Morgan explained the difficulty J.T. has posed by refusing to
answer questions concerning his plans to hurt himself: 

 My concern and belief is that the statements that he's made previously and now
refuses to discuss with us about his risk of self harm means that I cannot make a risk
prediction about his danger to himself. He may have an immediate plan the moment
he walks out the door here, with his failure to communicate with us on any level
about risk of suicide, suicidal thoughts, my concern is that he does still have that
plan, because I have no reason to think that that is gone out of his mind.

Dr. Morgan stated in her certificate of medical examination and during her testimony that she
considered J.T. at risk for self-harm. The doctors, who have treated J.T. at points throughout his stay
at Rusk State Hospital, explained that he refuses to take any medication and answers "No comment"
in response to questions about both his condition and more day-to-day topics relating to his physical
health, suggesting that J.T. chooses to continue in his pattern of behavior. Further, Dr. Morgan
explains that, in his July 2007 treatment meeting, J.T. read scripture concerning the "mark of the
beast": "The mark of the beast is still a part of his thinking and something that he wanted to
communicate with us. Even though he doesn't do that on a day-to-day basis, it is still a part of his
line of thinking." Based on his observations and review of J.T.'s progress, Dr. Srinivasan believes
that J.T. would harm himself if he were released from the hospital. He noted in his certification that
J.T. discussed "developing a perfect guillotine to decapitate himself." 

 If there were any confusion remaining as to whether J.T. planned to attempt suicide, J.T.
clarified his intentions during his own testimony on direct examination. Indeed, J.T.'s testimony at
trial clearly demonstrates that he continues to behave in a self-destructive manner. He testified at
trial that he believes the government placed on him the "mark of the beast" or a forerunner of such
mark. He explained that it is preferable to commit suicide than to be violated by the government. (7) 
Not surprisingly, J.T. then unequivocally expresses his plans to commit suicide and reconciles his
plan with his unaffiliated Christian beliefs by explaining that the "sophisticated" scheme by which
the government has placed this mark on his body allows him to make an exception to the general rule
that an individual should not kill:

 I don't say that I'm a harm to myself. I think that's the wrong word. In our Christian
Bible, its [sic] says that in the end times, in the book of Revelations, that the
government - we're going to be forced to take the mark of the beast. I mean, it spells
it out. It's Chapter 13. And - hold on. And then in Chapter 14, it says that those
who received the mark of the beast, they'll spend eternity in hell.

When his attorney asked him whether he planned to take his own life if released from the hospital,
J.T. replied, "Yes, I do." This testimony shows that J.T. continues to demonstrate both the state of
mind and the attendant pattern of behavior (8) that tend to confirm the likelihood of serious harm to
himself. His continued adherence to the idea that he bears the "mark of the beast," his insistence that
this mark justifies his suicide, his previous suicide attempts on that basis when he was under less
supervision, and his recent attempts to be placed on a lower observation status all serve as evidence
that J.T. continues to engage in a pattern of behavior that tends to confirm the likelihood that he
poses a risk of serious harm to himself.

 J.T. likens the evidence here to that presented in State of Texas for the Best Interest and
Protection of P.W., 801 S.W.2d 1, 3 (Tex. App.--Fort Worth 1990, writ denied). In P.W., a member
of the patient's family testified that the patient had called him and asked "where would be the best
place to hold [a] pistol to kill herself without causing a lot of pain." Id. The patient was also
convinced that everyone was an agent of her ex-husband and that he was tapping her telephone. Id. 
She had also destroyed a great deal of personal property. Id. Unlike the evidence in P.W., here J.T.
has at least twice attempted suicide and continues to espouse the same ideas that he used to justify
those prior attempts. He unequivocally testified that he does plan to commit suicide in order to avoid
the consequences of the "mark of the beast" that the government placed on him. He, unlike P.W.,
has taken steps to harm himself and continues to believe in his basis for committing suicide. J.T.
has demonstrated a pattern of behavior that tends to confirm he wants to commit suicide, whereas
the evidence only showed that P.W. asked questions about committing suicide. 

 J.T. also relies on Broussard v. State, 827 S.W.2d 619 (Tex. App.--Corpus Christi 1992, no
writ), and Johnstone v. State, 961 S.W.2d 385, 389 (Tex. App.--Houston [1st Dist.] 1997, no writ),
among other similar cases, to support his position that the evidence is insufficient. In Broussard,
the patient was ordered to receive temporary mental health services. (9) 827 S.W.2d at 619. The jury
found that the patient was mentally ill and, as a result, was likely to cause serious harm to others and
would, if not treated, continue to suffer severe and abnormal mental, emotional, or physical distress,
would continue to experience deterioration of his ability to function independently, and was unable
to make a rational and informed decision as to whether or not to submit to treatment. See Tex.
Health & Safety Code Ann. 574.034(a)(B), (C). The court easily concluded that there was no
evidence that Broussard was likely to harm others. Broussard, 827 S.W.2d at 622. The court then
outlined the relevant evidence to the other bases for the temporary commitment, including evidence
that the patient had six or seven prior admissions for the same condition. Id. at 620. Ultimately, the
court concluded that such evidence, along with evidence of the patient's continuing delusional
behavior and generalizations of her hostile behavior and provocative statements, failed to show a
recent "overt act or continuing pattern of behavior that would generally affect [her] ability to function
independently on a day-by-day basis without the imposition of court-ordered mental health services." 
Id. at 622. The court reasoned that evidence that merely reflects that an individual is mentally ill and
in need of hospitalization is no evidence that the statutory standard has been met. Id.

 In Johnstone, doctors testified that the patient in that case repeatedly refused to take his
medication and that his ability to function independently would continue to deteriorate. 961 S.W.2d
at 389. The court pointed out that the courts in Broussard and J.S.C. found that findings of this
nature are not specific enough to show an overt act or continuing pattern of behavior. The Johnstone
court noted that in Broussard, the addition of evidence that the patient had been repeatedly admitted
to mental institutions for the same condition still was not sufficient to show a continuing pattern of
behavior. See Johnstone, 961 S.W.2d at 389. The Johnstone court held the evidence was
insufficient to satisfy the statute.

 Here, the record goes beyond the mere fact that J.T. has been hospitalized several times
before. Rather, the evidence details the religious delusions concerning the mark of the beast and the
doctrine by which J.T. justifies his suicide. The record also shows a pattern of attempting suicide,
most notably right after he was moved to a lower observation status in the hospital. That attempt
was nearly successful; the staff had to cut J.T. down from his noose. Finally, the record confirms
that the doctors are not merely guessing at what J.T. will do when J.T. plainly states that he does plan
to commit suicide if he is released. The evidence provides the factual bases for the doctors' opinions
and also demonstrates that J.T. continues to engage in behavior consistent with the behavior that not
only justified his initial commitment, but also served as an independent basis for the trial court's
December 2007 order for extended mental health services. See L.S., 867 S.W.2d at 844 (order for
extended mental health services affirmed when evidence showed that, when untreated, patient
ritualistically burned his skin with cigarettes, drank excessive amounts of water resulting in reduced
sodium serum levels, placed nine-volt batteries to the exposed roots of his teeth, failed to maintain
sanitary hygiene, and walked into traffic without looking). 

 2. Refusal to Eat or Drink

 The evidence also shows that J.T. has started to deprive himself of food and fluids in attempts
to resolve perceived injustices against him. Dr. Morgan explained that J.T. will remain in the
bathroom without eating, drinking, meeting, or exercising due to staff members' "abuse of authority." 
Dr. Morgan described that J.T. perceived this abuse of authority when a staff member pulled his or
her hands back when J.T. extended his tray or silverware to the staff member in the dining hall. J.T.
testified that hospital staff also would not allow him to wash his hands before meals. J.T. also
believes he is entitled to money from the hospital's donation program (10) and has demonstrated his
protest by refusing to eat or drink until the issue is resolved. As a result, he has lost twenty-six
pounds in a little over two months and had to receive medical care on at least four occasions. 
According to Dr. Morgan, this type of weight loss is detrimental to J.T.'s health. Evidence that J.T.
regularly refuses to eat or drink at all, be it in protest to the injustices he perceives or otherwise, is
evidence of a recent overt act or a continuing pattern of behavior that tends to confirm that J.T. is
a risk of serious harm to himself.

V. CONCLUSION

 Considered in a light most favorable to the jury's finding, evidence that J.T. continues to
refuse food and fluids for extended periods of time and still plans to commit suicide because he
believes the government has placed on him the "mark of the beast" is evidence sufficient to produce
in the minds of the jury a firm belief that J.T. poses a serious risk of harm to himself, satisfying
Section 574.035(a)(2)(A). Giving due consideration to such evidence, we conclude that the evidence
concerning the doctors' difficulty in getting J.T. to answer many questions is not such that it would
prevent a reasonable jury from reconciling the disputed evidence in favor of its finding. The
evidence is both legally and factually sufficient. Having also concluded that the trial court did not 



abuse its discretion by admitting evidence referring to J.T.'s extended hospitalization, we affirm the
trial court's order. 



 Jack Carter

 Justice


Date Submitted: March 6, 2008

Date Decided: March 7, 2008
1. In a companion case, cause number 06-08-00010-CV, J.T. appeals from the related order
authorizing administration of psychoactive medication. See Tex. Health & Safety Code Ann.
§§ 574.104, 574.106 (Vernon Supp. 2007).
2. At the time of trial, J.T. was on "one-to-one" observation status while he was awake and was
on intake and output monitoring due to his recent refusal to eat or drink. In the past, J.T. had also
been placed on "close observation" status in which one staff member is assigned to closely monitor
up to three patients. 
3. We point out that the jury found two of the three bases under Section 574.035(a)(2). As
structured, the order does not create a problem. See In re J.S.C., 812 S.W.2d 92, 96 (Tex.
App.--San Antonio 1991, no writ) (holding that a "fill-in-the-blanks" judgment form must state the
findings of the statutory criteria conjunctively, not disjunctively). When the evidence sufficiently
establishes one criterion under Section 574.035(a), we are not required to decide whether there was
sufficient evidence to satisfy another basis for commitment. See In re R.M., 90 S.W.3d 909, 912
(Tex. App.--San Antonio 2002, no pet.); Mezick v. State, 920 S.W.2d 427, 431 (Tex.
App.--Houston [1st Dist.] 1996, no writ); Holliman v. State, 762 S.W.2d 656, 659 n.3 (Tex.
App.--Texarkana 1988, no writ). Accordingly, we have reviewed the record to determine whether
the evidence is sufficient to support either of the two bases found in this case.
4. "Mental illness" means an illness, disease, or condition, other than epilepsy, senility,
alcoholism, or mental deficiency, that: (A) substantially impairs a person's thought, perception of
reality, emotional process, or judgment; or (B) grossly impairs behavior as demonstrated by recent
disturbed behavior. Tex. Health & Safety Code Ann. § 571.003(14) (Vernon Supp. 2007).
5. To the extent that this contention would appear to raise the qualification of Dr. Morgan as
an expert, we note that the parties stipulated to the qualifications of Drs. Morgan and Srinivasan as
experts in the field of mental health.
6. For reference, we reiterate that Section 574.035(a)(2)(C) requires a showing that, as a result
of his or her mental illness, the proposed patient is 


 suffering severe and abnormal mental, emotional, or physical distress; experiencing
substantial mental or physical deterioration of the proposed patient's ability to
function independently which is exhibited by the proposed patient's inability, except
for reasons of indigence, to provide for the proposed patient's basic needs, including
food, clothing, health, or safety; and unable to make a rational and informed decision
as to whether or not to submit to treatment.

 

Tex. Health & Safety Code Ann. § 574.035(a)(2)(C).
7. We add that J.T. elaborated his justification for maintaining such a notion by referring to an
unidentified church's written material:


 I think there are reasonable exceptions. Let me give you one. In a book, I believe it's
called One Day at A Time, I can't remember, I think it might be - - it comes from the
voice of the [inaudible] organization out of Oklahoma, and it has 365 days listed in
it and a little short story on each page. And one of those stories in there was a
woman - - well, first of all, and there was a king in this - - It didn't give a lot of
specifics. It was pretty short. But a king would violate the women because he had
that much power, and - - married or not married, it didn't make any difference to him. 
And so, this woman that was married knew that the soldiers would come and get her,
and her husband run away. So, when they came and got her, she excused herself to
her bedroom and put a sword through herself. I think she done the right thing. There
are exceptions. I mean, rather than being violated, I'll take my life. Rather than
somebody violating me. I think there are exceptions to taking your life. And this - -
The government has secretly put something on my body. I think this is an exception. 
Whether this is the mark of the beast or not that the government has placed on me,
I don't know. It's highly sophisticated, and - - You just wouldn't believe it. But if it's
not the mark of the beast, it's a forerunner of it.


.
8. Though J.T. argued that the suicide attempts are not recent, we find it unnecessary to address
whether the 2001 or 2005 suicide attempts are "recent" overt acts as contemplated by Section
574.035(e).
9. Though Broussard does deal with court-ordered temporary mental health services, and we
are examining here an order for extended mental health services, we note the similarity between the
standards in Sections 574.034(a)(2)(C) and 574.035(a)(2)(C). Nonetheless, the state of the evidence
in the instant case most notably distinguishes it from Broussard. 
10. Dr. Morgan explained that there is a volunteer services program separate from but
associated with the hospital that will allot a certain small amount of spending money to indigent
patients so that those patients can spend that money at the hospital canteen. She explained that a
patient who receives money from an outside source is not eligible for the donation program. J.T.
testified that he asked friends for money to buy stamps so that he could send letters. He testified that
he was forced to ask for money because the donation program was not giving him any money. The
record does not otherwise clarify whether J.T. stopped receiving the donation program money before
or after his friends sent him money.