NO. 07-03-0171-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL C

NOVEMBER 25, 2003
_____

IN THE INTEREST OF C.J.F., A CHILD

_____

FROM THE 69TH DISTRICT COURT OF DALLAM COUNTY;

NO. 9852; HONORABLE PHIL VANDERPOOL, JUDGE

_____

Before JOHNSON, C.J., and QUINN and REAVIS, JJ.

**OPINION**

Following a jury's recommendation, the trial court entered an order terminating appellants Brenda Thaxton's and Nathan Felder's parental rights in their son C.J.F. By this appeal, Brenda and Nathan contend the trial court erred in (1) refusing to submit a charge to the jury regarding their imprisonment at the time of trial; (2) broadening the definition of "endanger" in the charge; and (3) admitting into evidence autopsy photos of one of Brenda's other children. Brenda also challenges the legal and factual sufficiency

of the evidence to support the order of termination, while Nathan makes only a factual insufficiency claim. Finally, Brenda alleges the trial court erred in denying her motion for an instructed verdict. Based upon the following rationale, we will affirm.

Brenda is the mother of five children. Her oldest child, a girl, resides with Brenda's father and stepmother, two of Brenda's sons live with their father, one son, N.T., is dead, and the child the subject of this suit, C.J.F., is in foster care. At the time of C.J.F.'s birth on September 17, 2001, Brenda was incarcerated in the Dallam County Jail on charges of endangering a child and injury to a child by omission arising from her alleged acts or omissions related to the death of N.T. in April of 2001. Nathan Felder, Brenda's former boyfriend and the father of C.J.F., was charged with the capital murder of N.T. At the time of C.J.F's birth, Nathan, like Brenda, was also incarcerated, having had his parole for a fifty year sentence on a burglary of a building conviction revoked when he was charged with capital murder.

The Department of Protective and Regulatory Services (the Department), appellee, removed C.J.F. from Brenda's custody two days after his birth and filed a petition to terminate hers and Nathan's parental rights. As grounds for termination, the Department contended, as pertinent to this appeal, that Brenda and Nathan engaged in conduct or knowingly placed C.J.F. with persons who engaged in conduct which endangered his physical or emotional well being. In March of 2003, while criminal charges were still

2

pending against Brenda and Nathan, the trial court commenced a jury trial on the Department's third amended petition.

During the Department's case in chief, Brenda testified that at the time of trial she had been in jail almost two years. Additionally, she admitted serving time in a New Mexico prison for a 1989 burglary conviction. Brenda explained that she began using drugs, specifically, marihuana, alcohol, and speed, when she was 13 years old. She claimed that, although she did not have custody of any of her children, her parental rights had never been terminated. Brenda told the jury that she and N.T. began living with Nathan in January of 2001, four months before N.T.'s death. But while Brenda provided the preceding information, she invoked her Fifth Amendment[1] privilege against self-incrimination in response to over forty of the Department's and C.J.F.'s *ad litem*'s other questions. In particular, Brenda invoked the privilege when questioned, *inter alia*, whether (1) she used drugs in front of her children; (2) she used drugs while pregnant with C.J.F.; (3) she sold drugs; (4) she offered to sell N.T. for drugs; (5) Nathan used drugs; (6) she noticed bruising on N.T. in January, February, March, or April of 2001; (7) it was in C.J.F.'s best interest to live with her; and (8) she did everything she could to protect N.T.

When Nathan testified, he told the jury that he had been convicted of burglary and aggravated assault and had spent time in prison for each conviction. In fact, Nathan

---

[1]U.S. Const. amend. V.

admitted he had spent only four years of his adult life outside the prison system. Nathan acknowledged that he, his mother, and Brenda were the only adults to care for N.T. during the 12 weeks that N.T. and Brenda lived with him. However, while Nathan claimed he did not "raise" N.T., he acknowledged he "spent time with him every day all day long." Nathan confirmed "there was no one else in the home other than Brenda, N.T. and "him." Additionally, Nathan told the jury that he was six feet, three inches tall and weighed 250 pounds, but he described N.T. as "a little biddy dude." Nathan refused to answer over fifty other questions posed to him by the Department and the *ad litem* for C.J.F. on the basis that his answers might incriminate him. In particular, Nathan invoked his Fifth Amendment privilege when asked about, *inter alia*, what happened on the day of N.T.'s death and whether (1) he used drugs; (2) he ever used drugs in the presence of children; (3) he sold drugs; (4) Brenda used or sold drugs; (5) he committed violence against Brenda or N.T.; (6) he threatened to kill Brenda; (7) he ever slapped or hit N.T.; (8) he ever picked up N.T. and slammed him on the toilet when potty training him; (9) he ever saw bruises on N.T.; and (10) he had an explanation for any of the injuries discovered on N.T. at autopsy.

Cecil Thaxton, Brenda Thaxton's father, averred that he loved his daughter very much, and that he spoke with her at least once a week even during her two-year incarceration leading up to trial. However, Mr. Thaxton considered Brenda to be a drug addict, and he did not think it was in C.J.F.'s best interest that Brenda raise him. He flatly declared, "[s]he's not a – she's just not a mother." Rather, Mr. Thaxton concluded "I think

4

C.J.F. would be better off where he's at." The Department then called C.J.F.'s foster mother to testify. She explained that C.J.F. had been in her home for 18 months, and she described him as "[a] happy little boy. Always smiling." The foster mother testified that she and her husband hoped to adopt C.J.F. if Brenda's and Nathan's parental rights were terminated.

The vast majority of the Department's case revolved around the death of N.T. Rodney Tucay, the medical examiner who performed the autopsy, testified that N.T., who was not quite two and a half years old at the time of his death, died of a "blunt force injury to the head." Specifically, Dr. Tucay averred that N.T. suffered at least 37 blunt force injuries to his body, with 19 of those occurring on his head. The latter included "injuries of the deep skull tissue as well as [a] subdural hemorrhage and [a] hemorrhage of the front of the brain." Also, according to Dr. Tucay, some of the injuries to N.T.'s body were "older than others." Doctor Tucay opined that N.T.'s multiple injuries were not caused by a fall, nor were they sustained in a "particular accident." Rather, Dr. Tucay suggested they represented "an ongoing pattern of abuse." To illustrate the injuries about which Dr. Tucay testified, the Department offered into evidence three photographs of N.T.'s body prior to the autopsy. Doctor Tucay averred that "[i]f the mother would change the clothing, the injuries [depicted in the photographs] would be seen." In addition to the testimony regarding N.T.'s head injuries and external bruising, Dr. Tucay told the jury about his examination of an injury to N.T.'s intestine. Doctor Tucay opined that "to create this

particular injury, this injury must have been caused by a blow to this particular area" and the "blow would have been a big – caused by a big force" because the internal organs are "well-protected within the body." Again, Dr. Tucay testified that the injuries to N.T.'s intestines could not have been caused by a fall. The Department offered and the court admitted into evidence a photograph depicting N.T.'s intestines at autopsy.

At the conclusion of the Department's case-in-chief, Brenda and Nathan moved for instructed verdicts, which the court denied. Thereafter, Brenda called Carla Roddy, one of Nathan's former girlfriends to testify. Carla had prior convictions for failure to stop and render aid and driving while intoxicated. She told the jury that on more than one occasion during her relationship with Nathan she was admitted to the hospital for injuries she sustained during physical assaults by him. She claimed that he would hit her with his fist "everywhere." And while she admitted that Nathan never abused her then one year old daughter, Carla also told the jury that she never left the child alone with him. In fact, she maintained that she "did not trust him around [her] daughter because he was on drugs sometimes." Additionally, Carla asserted that she called the police on a number of occasions after Nathan beat her, but they never charged him with anything. Carla claimed, however, that she "put a restraining order on him."

Susan Bainham testified that she gave Brenda a ride home from the local grocery store on April 22, 2001. According to Susan, Brenda, whom Susan had met earlier that day at the store, appeared tired, but calm, on the trip to the trailer home Brenda shared

6

with Nathan and N.T. Upon their arrival at the trailer, Susan heard a man, whom she later learned to be Nathan, yell for Brenda to come inside. Brenda left her groceries and disappeared into the trailer while Susan waited in the car for Brenda to return. Almost immediately, Susan saw Nathan run out of the trailer carrying a little boy she later learned to be N.T. According to Susan, Brenda "was hysterical and very upset" and "[s]he just kept saying, what happened, what happened." Susan noticed that N.T. had blood coming out his nose and mouth and his hair was wet as if he had been bathed recently. Additionally, Susan said, "[i]t was like his windpipe was crushed, and he had a mark on the side of his head." She also noticed a bruise on N.T.'s chest, but when she attempted to remove the blanket covering the child to check for bleeding, Nathan prevented her from doing so. Susan remarked that the mark on N.T.'s head "was the size of Nathan's hand."

Brenda's final witness was Josh Pruitt, the Department caseworker assigned to handle her case. Josh told the jury that, according to the family service plan developed by the Department, Brenda was required "to inform the Department of any changes and correspond with C.J.F. and write him letters." Josh explained that because of Brenda's incarceration, the family service plan placed no additional requirements upon her. According to Josh, Brenda complied with both requirements; however, she did not initiate contact with C.J.F. until August of 2002, when he was nearly one year old. Josh believed that it was in C.J.F.'s best interest for Brenda's and Nathan's parental rights to be terminated.

7

By her first issue and his fourth, Brenda and Nathan complain the evidence is factually insufficient to support the verdict. Brenda also includes in her first issue a challenge to the legal sufficiency of the evidence. With her fifth issue, Brenda complains the trial court erred in denying her motion for instructed verdict because there was no evidence to establish a jury's finding of termination of her parental rights by clear and convincing evidence. With each issue, we disagree.

Initially we note that an appeal from the denial of a motion for instructed or directed verdict is essentially a challenge to the legal sufficiency of the evidence. Fein v. R.P.H., Inc., 68 S.W.3d 260, 265 (Tex.App.–Houston [14th Dist.] 2002, pet. denied). Therefore, we address Brenda's first and fifth issues contemporaneously. The parent-child relationship may be terminated if the parent has engaged in any of the conduct set out as grounds for termination in the Family Code, and termination is in the child's best interest. Tex. Fam. Code Ann. § 161.001 (Vernon 2002). Both of these elements must be established by clear and convincing proof. *Id*. In a legal sufficiency review of the evidence to support an order terminating parental rights, we look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true. In re. J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). To give appropriate deference to the factfinder's conclusions and the role of a court conducting a legal sufficiency review, looking at the evidence in the light most favorable to the judgment means that a reviewing court must assume the factfinder resolved disputed facts in favor

8

of its finding if a reasonable factfinder could do so. *Id*. Thus, we disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible. *Id*.

The standard for reviewing the factual sufficiency of termination findings is whether the evidence is such that a reasonable jury could form a firm belief or conviction about the truth of the Department's allegations. In re C.H., 89 S.W.3d 17, 25 (Tex. 2002). Under that standard, we consider whether the disputed evidence is such that a reasonable factfinder could not have resolved the disputed evidence in favor of its finding. In re J.F.C., 96 S.W.3d at 266. If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient. *Id*.

## ENDANGERMENT

As its sole ground for termination of both Brenda's and Nathan's parental rights, the Department alleged they engaged in conduct or knowingly placed C.J.F. with persons who engaged in conduct which endangered his physical or emotional well-being. Tex. Fam. Code Ann. § 161.001(1)(E). Endanger means to expose to loss or injury or to jeopardize. Texas Dept. of Human Services v. Boyd, 727 S.W.2d 531, 533 (Tex. 1987). While endanger means more than a threat of metaphysical injury or the possible ill effects

9

of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffers harm. *Id*. The specific danger to the child's well-being need not be established as an independent proposition, but may instead be inferred from parental misconduct. In re S.Z.G., 2003 WL 21771759, at *6 (Tex.App.–Tyler July 31, 2003, no pet.). If a parent abuses or neglects the other parent or children, that conduct can be used to support a finding of endangerment even against a child who was not yet born at the time of the conduct. In the Interest of W.J.H., 111 S.W.3d 707, 716 (Tex.App.–Fort Worth 2003, pet. denied). Additionally, domestic violence, want of self-control and propensity for violence may be considered as evidence of endangerment. In re J.I.T.P., 99 S.W.3d 841, 845 (Tex.App.–Houston [14th Dist.] 2003, no pet.). Finally, the need for permanence is a paramount consideration for the child's present and future physical and emotional needs. *In re S.Z.G*, 2003 WL 21771759, at *6.

In the appeal of an order terminating parental rights under section 161.001(1)(E), we must look at the parent's conduct alone, including actions, omissions, or the parent's failure to act. In re D.J., 100 S.W.3d 658, 662 (Tex.App.–Dallas 2003, pet. filed). It is inconsequential that the parental conduct occurred before or after the child's birth. In re U.P., 105 S.W.3d 222, 229 (Tex.App.–Houston [14th Dist.] 2003, pet. filed). Indeed, the law does not require that the child be a victim of abusive conduct before the Department can involuntarily terminate a parent's rights to the child. Dallas Cty. Child Prot. Serv. v. Bowling, 833 S.W.2d 730, 733 (Tex.App.–Dallas 1992, no pet.). Rather, if the evidence

10

shows a course of conduct which has the effect of endangering the emotional well-being of the child, a finding under section 161.001(1)(E) is supportable. In the Interest of B.B., 971 S.W.2d 160, 169 (Tex.App.–Beaumont 1998, pet. denied)(*citing* section 15.02(1)(E), the predecessor to the current statute).

Brenda claims "the only evidence presented which will support the decision to terminate . . . is that [she] had a prior child [N.T.] allegedly harmed and killed by Nathan Felder, who is the father of the child, [C.J.F.]; and that [she] has been in jail and is unable to care for [C.J.F.]." Similarly, Nathan claims that other than his criminal background and the negative inferences that could be drawn from the invocation of his Fifth Amendment right against self incrimination, the only other evidence the Department established to prove its ground for termination was that (1) he was with N.T. at or near the time of the injuries that caused N.T.'s death; (2) he possibly knew about previous injuries to N.T. and did nothing about them; and (3) he was abusive to a former girlfriend. Our review of the record with respect to both parents, however, leads us to the conclusion that there is additional legally and factually sufficient evidence to support the jury's recommendation on the issue.

Brenda's father considered her to be a drug addict who would "leave her child in the middle of the night and just say, you know, that's the way it is." He concluded that, based upon his observations of Brenda with her other four children, she would be unable to care for C.J.F. Indeed, the evidence revealed that none of Brenda's five children lived with her.

11

And while Brenda admitted she began using drugs at the age of 13, she refused to answer a host of other questions about her drug use and its effects on her family and her ability to parent.

From Carla, the jury learned that Nathan was physically abusive, and that she did not trust him with her child because of his propensity to do drugs. Susan told the jury that one of the many bruises on N.T.'s head was the same size and shape as Nathan's hand. Nathan told the jury about his violent criminal background which resulted in his incarceration for all but four years of his adult life. He also admitted that he and Brenda were the only people in the home with N.T. Like Brenda, however, Nathan invoked his Fifth Amendment right against self-incrimination numerous times in response to questions about his and Brenda's drug use, his lack of self control with N.T., and his actions on the day of N.T.'s death.

A jury may draw an adverse inference against a party who pleads the Fifth Amendment. Texas Capital Securities, Inc. v. Sandefer, 58 S.W.3d 760 779 (Tex.App.–Houston [1st Dist.] 2001, pet. denied)(*citing* Baxter v. Pamigiano, 425 U.S. 308, 318, 96 S.Ct. 1551, 1558, 47 L.Ed.2d 810, 821, (1976)). Refusal to answer questions by asserting the privilege is relevant evidence from which the finder of fact in a civil action may draw whatever inference is reasonable under the circumstances. Lozano v. Lozano, 983 S.W.2d 787, 791 (Tex.App.–Houston [14th Dist.] 1998)(*also citing Baxter*, 425 U.S. at

12

318), *rev'd on other grounds*, 52 S.W.3d 141 (Tex. 2001).[2] Thus, a jury may have drawn adverse inferences from Nathan and Brenda's refusal to *answer the multitude of questions propounded to them by the Department and C.J.F.'s ad litem*.

Viewing the evidence in the light most favorable to the finding, a reasonable factfinder could have concluded that Brenda was a drug addict who abused drugs while pregnant and whose drug use interfered with her ability to parent her children; that Brenda was unable to parent any of her other four children; that Nathan physically abused Brenda; that Nathan physically abused, and ultimately killed, N.T.; that Nathan's course of conduct with N.T. indicated he would pose a similar threat to C.J.F.; that Brenda left N.T. with Nathan knowing that Nathan was physically abusing him; that she would be similarly unprotective of C.J.F.; and that Brenda and Nathan have been in jail for all of C.J.F.'s life and have no plans for raising him. Nathan's abuse of Brenda alone can suffice to support termination of his parental rights. Lucas v. Texas Dept. of Protective and Regulatory Services, 949 S.W.2d 500, 503 (Tex.App.–Waco 1997, writ denied). Likewise, the singular fact that Brenda allowed N.T. to remain unattended in the company of one she knew had abused him in the past provides a basis for termination of her parental rights to C.J.F. under section (E). *See* In re J.M.C.A., 31 S.W.3d 692, 698 (Tex.App.–Houston [1st Dist.] 2000, no pet.). Moreover, while Brenda's and Nathan's current incarceration, standing

---

[2]At least one appellate court has applied the *Baxter* holding in parental termination cases. *See* In re P.A.O., M.P.O., and S.L.O., Minor Children, 2001 WL 175620 (Tex.App.–El Paso February 22, 2001, pet. denied)(not designated for publication).

alone, does not constitute engaging in conduct which endangers the emotional or physical well-being of the child, it is a fact properly considered on the issue of endangering. In re D.M., 58 S.W.3d 801, 812 (Tex.App.–Fort Worth 2001, no pet.). Here, Brenda's and Nathan's imprisonment merely contributes to the jury's finding. Therefore, we conclude the evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a belief or conviction to the truth of the allegations that Brenda and Nathan engaged in conduct which jeopardizes the well-being of C.J.F.

Although Brenda testified that she will protect C.J.F. from violent situations, the jury could have chosen to disbelieve her and to determine, instead, that her course of conduct relating to N.T. belied her testimony. Furthermore, while we do not question Brenda's love for her children and her horror at N.T.'s death, the jury was entitled to conclude that those emotions were insufficient to provide for C.J.F.'s needs. Additionally, while Nathan attempted to establish, through his cross-examination of Dr. Tucay, that many of N.T.'s injuries were caused by accidents and were "non-serious," the jury could have chosen to believe Dr. Tucay's assessment to the contrary. Thus, although there is some disputed evidence, we find that it was not so significant that a reasonable trier of fact could not have reconciled it in favor of its finding and formed a firm belief or conviction that Brenda and Nathan engaged in conduct which endangers C.J.F.'s physical or emotional well-being.

**BEST INTEREST OF THE CHILD**

14

In determining the best interest of the child, a number of factors have been considered including: (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. Holley v. Adams, 544 S.W.2d 367, 371-72 (Tex. 1976). These factors are not exhaustive; some listed factors may be inapplicable to some cases, while other factors not on the list may also be considered when appropriate. *In re C.H.*, 89 S.W.3d at 27. Furthermore, undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *Id*. In contrast, the presence of scant evidence relevant to each *Holley* factor will not support such a finding. *Id*. Evidence that proves one or more statutory grounds for termination may also constitute evidence illustrating that termination is in the child's best interest. *Id*. at 28. The Department simply must have presented enough evidence from which the factfinder could reasonably have formed a firm conviction or belief that the child's best interest warranted termination. In re D.S.A., 113 S.W.2d 567, 574 (Tex.App.–Amarillo 2003, no pet.).

Here, there is evidence that (1) Brenda is a drug addict; (2) she used drugs while pregnant with C.J.F.; (3) she has never raised any of her five children into puberty; (4) her own father believes it is in C.J.F.'s best interest that her parental rights be terminated; (5) she failed to protect N.T. from abuse by Nathan; (6) she has been in jail all of C.J.F.'s life; (7) she has no plan for caring for C.J.F. while she is in jail; and (8) the foster family with whom C.J.F. has lived nearly all of his life has never "had any problems in [their] home criminally," has never been "investigated for abuse of a child," and has agreed to provide C.J.F. with a loving and safe environment if allowed to adopt him. Additionally, there is evidence that Nathan (1) is a career criminal; (2) is physically abusive; (3) is a drug seller and addict; (4) physically abused, and ultimately killed, another child; and (5) has been in jail for all of C.J.F.'s life and has no plan for raising him. We conclude the preceding evidence, viewed in the light most favorable to the finding, is sufficiently clear and convincing that a reasonable trier of fact could have formed a firm belief or conviction that terminating Brenda's rights was in the best interest of C.J.F. We acknowledge, as Brenda asserts, that there is a "strong presumption that the best interest of a minor is usually served by keeping custody in the natural parents." Matter of R.W., 545 S.W.2d 573, 581 (Tex.App.–Houston [1st Dist.] 1976, no writ). However, because the Department successfully rebutted that presumption, there remains no evidence that is so significant that a reasonable trier of fact could not have reconciled the evidence in favor of its finding that termination of Brenda's and Nathan's parental rights in C.J.F. was in his best interest. *In the Interest of J.I.T.P.*, 99 S.W.3d at 846. In short, the evidence is legally and factually

16

sufficient to establish that termination of Brenda's and Nathan's parental rights is in C.J.F.'s best interest. Brenda's first and fifth issues and Nathan's fourth are overruled.

By their second issue, Brenda and Nathan complain the trial court erred in refusing to submit in its charge to the jury the following instruction: "Mere imprisonment will not, standing alone, constitute engaging in conduct which endangers the emotional or physical well-being of a child." We disagree. Explanatory instructions should be submitted when, in the sole discretion of the trial court, they help the jurors understand the meaning and effect of the law and the presumptions the law creates. Ishin Speed Sport, Inc. v. Rutherford, 933 S.W.2d 343, 349 (Tex.App.–Fort Worth 1996, no writ). A trial court's refusal to submit an explanatory instruction will not be overturned on appeal unless the court abused its discretion. Magro v. Ragsdale Bros. Inc., 721 S.W.2d 832, 836 (Tex. 1986). No abuse of discretion is shown unless the requested instructions were so necessary to enable the jury to render a proper verdict that the court's refusal probably did cause the rendition of an improper verdict. Harris County v. Bruyneel, 787 S.W.2d 92, 94 (Tex.App.–Houston [14th Dist.] 1990, no writ). Here, while Brenda's and Nathan's requested instruction is an accurate reflection of the law, it was not necessary to enable the jury to render a proper verdict. The Department advanced a number of theories to persuade the jury that there were sufficient grounds upon which to terminate Brenda's and Nathan's parental rights. The fact that Brenda and Nathan had been incarcerated for all of C.J.F.'s life was but one of those theories. Indeed, the Department relied more heavily

17

upon other theories, not the least of which were that Nathan abused, and ultimately killed another child, and that Brenda knew about but failed to protect that child from the abuse. Thus, the trial court did not abuse its discretion in refusing to give the requested instruction. Brenda's and Nathan's second issue is overruled.

Brenda and Nathan contend by their third issue that the trial court erred in submitting the following instruction to the jury: Endanger means to expose to loss or injury; to jeopardize; it is not necessary that the conduct be directed at the child or that the child actually suffer injury. We disagree. The standard for review of a jury charge is abuse of discretion, and it occurs only when the trial court acts without reference to any guiding principle. Texas Dept. of Human Services v. E.B., 802 S.W.2d 647, 649 (Tex. 1990). A trial court must submit "such instructions and definitions as shall be proper to enable the jury to render a verdict." Tex. R. Civ. P. 277. This rule affords the trial court considerable discretion in deciding what instructions are necessary and proper in submitting issues to the jury. State Farm Lloyds v. Nicolau, 951 S.W.2d 444, 451 (Tex. 1997). For an instruction to be proper, it must (1) assist the jury, (2) accurately state the law, and (3) find support in the pleadings and the evidence. In re K.M.B., 91 S.W.3d 18, 27 (Tex.App.–Fort Worth 2002, no pet.).

Here, Brenda and Nathan were in jail at the time of C.J.F.'s birth and have never had physical custody of him. To prove its case for termination of her parental rights in C.J.F. then the Department relied in large part upon Brenda's conduct with her other

18

children, specifically, her failure to protect N.T. from abuse by Nathan. Similarly, the Department attempted to show that Nathan's course of conduct with N.T. placed C.J.F. at risk for abuse. The instruction given by the trial court, therefore, assisted the jury in reaching its verdict and accurately stated the definition of endanger as developed by the Texas Supreme Court. *See Boyd*, 727 S.W.2d at 533. Given the broad latitude that trial courts have in giving jury instructions, we cannot say that the trial court acted without any regard to guiding principles in deciding what issues were necessary and proper. *In re K.M.B.*, 91 S.W.3d at 27. Brenda's and Nathan's third issue is overruled.

By her fourth issue and his first, Brenda and Nathan contend the trial court erred in admitting into evidence four autopsy photographs of N.T. because they were not relevant, and their probative value was substantially outweighed by the danger of unfair prejudice to her under Rule 403 of the Rules of Evidence. We disagree. We review a trial court's admission or exclusion of evidence for an abuse of discretion. In re J.W., 113 S.W.3d 605, 612 (Tex.App.–Dallas, 2003, no pet.)(*citing* City of Brownsville v. Alvarado, 897 S.W.2d 750, 753 (Tex. 1995)). Because the best interest of the child must be the court's primary consideration in a suit affecting the parent-child relationship, Rule 403 is an extraordinary remedy that must be used sparingly. *Id*.

Visual or demonstrative evidence is admissible if it tends to resolve a relevant issue, as long as its probative value substantially outweighs the danger of unfair prejudice. Tex. R. Evid. 403; *In re K.M.B.,* 91 S.W.3d at 29. Evidence is relevant if it has the

19

tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence. Tex. R. Evid. 401. To properly apply Rule 403 to relevant evidence, the trial court must balance and weigh the probative effect of the evidence against its potential for unfair prejudice or confusion. LSR Joint Venture No. 2 v. Callewart, 837 S.W.2d 693, 698 (Tex.App.–Dallas 1992, writ denied). In weighing the probative value of the evidence against the danger of unfair prejudice, the court must first examine the necessity for and probative effect of the evidence. *Id*. The fact that photographs are gruesome does not render them inadmissible. Fibreboard Corp v. Pool, 813 S.W.2d 658, 671 (Tex.App.–Texarkana 1991, writ denied), *cert. denied*, 508 U.S. 909, 113 S.Ct. 2339, 124 L.Ed.2d (1993).

As we have noted a number of times, the crux of the Department's case for termination of Brenda's parental rights in C.J.F. was that she was aware that Nathan was abusing N.T. but failed to do anything about it, and that she would pose a similar risk to C.J.F. if afforded the opportunity. Likewise, one of the Department's theories for termination of Nathan's parental rights in C.J.F. was that he abused over time, and ultimately killed, another child, N.T. According to Dr. Tucay, exhibits 2, 3, and 4 demonstrated that N.T. suffered an ongoing pattern of abuse–a pattern of abuse that would have been noticed by Brenda when she bathed N.T. or changed his clothes. The Department offered exhibit 5, the photograph of N.T.'s hemorrhaged intestine, to refute any testimony by Brenda or Nathan that the injury was caused by an accidental fall and to

20

illustrate the severity of the abuse. Thus, the trial court could reasonably have concluded that the photographs were relevant to whether N.T. was being physically abused, whether Brenda failed to protect N.T. from the abuse, and whether they would, similarly endanger C.J.F. by that course of conduct.[3] Additionally, the photographs aided the jury in understanding Dr. Tucay's testimony about how he arrived at his conclusions. The trial court also could have reasonably concluded that the probative value of the autopsy photographs was not substantially outweighed by the danger of unfair prejudice. Furthermore, assuming *arguendo* the trial court erred in admitting the photographs, Brenda and Nathan have failed to demonstrate that a substantial right of theirs was affected, and that the error probably caused the rendition of an improper judgment. Tex. R. App. P. 44.1(a); *Alvarado*, 897 S.W.2d at 753. Brenda's fourth and Nathan's first issues are overruled.

Accordingly, the judgment of the trial court is affirmed.

Don H. Reavis
Justice

---

[3]The Dallas Court of Appeals case attached as an appendix to Brenda's brief lends additional support to our resolution of this issue. Williams v. Texas Department of Protective and Regulatory Services, 1998 WL 423474 (Tex.App–Dallas July 29, 1998, writ denied)(not designated for publication). In that case, as in this one, the autopsy photographs were relevant and admissible to establish the mother's knowledge of abuse to her child by another adult.