NO. 07-07-0391-CV

IN THE COURT OF APPEALS

FOR THE SEVENTH DISTRICT OF TEXAS

AT AMARILLO

PANEL A

AUGUST 12, 2008

_____

IN THE INTEREST OF T.H., T.H., and D.H., CHILDREN

_____

FROM THE COUNTY COURT AT LAW NO. 1 OF RANDALL COUNTY;

NO. 4670-L1; HONORABLE JAMES W. ANDERSON, JUDGE[1]

_____

Before CAMPBELL and HANCOCK and PIRTLE, JJ.

**MEMORANDUM OPINION**

Appellant, Julie, appeals from a final order terminating her parental rights to her

three minor children, T.H., T.H., and D.H.[2] She asserts the evidence is factually insufficient

---

[1]Although the *Order of Termination* at issue was signed by the Honorable Ronnie Walker, the Reporter's Record reflects that the Honorable James W. Anderson presided over the proceedings.

[2]To protect the privacy of the parties in this case, we identify the children by their initials. *See* Tex. Fam. Code Ann. § 109.002(d) (Vernon 2002). The parents and private parties will be referred to by their first names only. *Id.*

to support the trial court's findings that she (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children, and (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children. She does not contest the trial court's decision that termination was in the best interests of the children. We affirm.

## Background

Julie, twenty-four years old, has continually used drugs since she was fourteen. Due to her drug use, she failed to complete high school. Between the ages of fourteen and twenty, she had three children by Timothy –T.H., T.H., and D.H. Although she did not use drugs in front of her children, she was using daily and under the influence of drugs when she was with them. When her children were not living with Julie, they lived with her mother.

After Timothy abandoned Julie, her mother supported her and her children. In October 2003, Julie was "validated" by Child Protective Services[3] for abuse and neglect. Because of her drug use and belief that her life was out of control, she left her children in her sister's custody. However, in March 2004, Julie's sister could no longer keep the

_____

[3]The Child Protective Services Division (CPS) of the Texas Department of Family and Protective Services (DFPS) investigates reports of abuse and neglect of children. For purposes of this opinion, both the agency and the investigatory division will be referred to as "the Department."

children and Julie voluntarily placed them in a foster home through Kelly Smith, Regional Administrator of the Methodist Children's Home in Lubbock, Texas. At the time of their placement, Smith offered Julie services for inpatient and outpatient drug and alcohol treatment but Julie did not take advantage of the services. At that time, the children were four, three, and one years old.

After Smith placed the children with a foster family, Roonie, Julie's mother, decided she wanted custody of the children. Smith and a Captain for the Amarillo Fire Department visited Roonie's house. Inside the residence, they observed open garbage, mice in the kitchen area, electric wires hanging out of outlets, and one-half inch of water standing in the basement. There were no smoke detectors and the house was heated by numerous space heaters. Much of the house was under construction. These conditions prompted the Fire Captain to declare the house unsafe and uninhabitable.

While the children were in foster care, Julie and Roonie had weekend visitations with them. Roonie had the most contact visiting nearly every other weekend. Julie visited less often, was using methamphetamines daily, and was under the drug's influence when she visited the children.

In 2006, Smith became concerned for the children's welfare. The children reported to her that, during weekend visitations, a friend of Roonie's was spanking them with a belt and leaving them alone in Roonie's house. Smith was also concerned that the children were allowed unsupervised contact with Roonie's boyfriend, Jim, who was investigated by

3

the Department and believed to be a sexual perpetrator. Due to these concerns, Smith made referrals to the Department. Throughout the time the children were placed with Methodist Children's Home, Smith could not get Julie to contact her and went through Roonie.

Amy Hogan conducted a Department investigation. Her investigation indicated that, while the children were at the foster home, they had weekend visitations with Julie and Roonie. She verified that the children were being allowed unsupervised contact during weekend visitation with Jim who was "validated" by the Department for sexual abuse. The Department believed Jim frequented, or was living, at Roonie's house. Aside from the children's unsupervised contact with Jim, Hogan was also concerned with the condition of Roonie's house. In June 2006, Smith turned custody of the children over to the Department. Smith did not believe that Julie had made any progress toward the development of any parenting skills during the period she had placed the children with the Methodist Children's Home–March 2004 to June 2006.

A second Department investigation led to a determination that Julie endangered the children's physical and emotional well-being while the children were living in the foster home by using methamphetamines around the children, permitting them to stay in her mother's house, and allowing unsupervised contact with Jim.

On June 9, 2006, the Department filed an original petition for protection of the children seeking conservatorship and the termination of parental rights belonging to

4

Timothy and Julie pursuant to § 161.001 of the Texas Family Code.[4] On June 22, 2006, a full adversary hearing was held after which the Department was appointed temporary managing conservator of the children. At the hearing, Julie appeared with counsel and agreed to the terms of the order. The order required Julie to undergo a court-ordered psychological or psychiatric evaluation and adhere to any recommendations made by the therapist, attend counseling sessions to address issues leading to the removal of the children from the home, comply with the Department's service plan, and "complete any and all other services court-ordered" during the pendency of the suit. The order stated:

> [T]he Court finds and hereby notifies the parents that each of the actions required of them below are necessary to obtain the return of the children, and failure to fully comply with these orders may result in the restriction or termination of parental rights.

On October 4, 2006, the trial court held a permanency hearing. Although Julie was notified, she did not appear and the trial court found she had not demonstrated adequate and appropriate compliance with the service plan. On December 12, 2006, while the termination proceedings were still pending, Julie was incarcerated and pled guilty to burglary.

In January 2007, Julie underwent a psychological evaluation performed by Delois Hinders of Leta Acker and Associates. Hinders's psychological testing indicated Julie

---

[4]Timothy did not contest termination of his parental rights in the trial court nor is he a party to this appeal.

suffered from severe depression, possibly psychosis. Hinders was concerned that, although Julie had used methamphetamines since she was fourteen without any treatment, she did not view herself as an addict. Hinders was also concerned with Julie's lack of ability to support herself and her children because she did not have a GED, had never been employed, lived at home with her mother, had no organized plan for supporting herself and her children, and did not have a driver's license or identification. Hinders noted Julie had not used drugs since she was incarcerated in November 2006 but was concerned about Julie functioning as a parent, in part, because of an increased probability of physical abuse and neglect. She recommended that Julie (1) undergo drug testing on a regular basis, (2) receive a psychiatric evaluation of her depressive symptoms, (3) undergo intensive outpatient substance abuse treatment, (4) attend a twelve-step group daily until she could get into a treatment program, (5) undergo individual therapy, parenting classes, anger management, coping skills development, and (6) make some progress toward being independent such as obtaining her GED, finding work, and obtaining a driver's license. Hinders did not recommend reunification occur until Julie had made some significant progress toward these goals. However, because Julie had taken seven months to obtain the psychological evaluation and at least another six months would be required to implement her recommendations, Hinders did not believe Julie would become a functioning parent anytime in the near future. Moreover, based on Julie's past behavior, Hinders believed "her prognosis [was] very poor."

6

In early 2007, the trial court held two permanency hearings. Although Julie was notified of the hearings, she did not appear at either hearing and the trial court found in each proceeding that she had not demonstrated adequate and appropriate compliance with the service plan.

On August 30, 2007, the trial court held a final hearing. Julie appeared in person and through counsel. At the hearing, Julie testified she had not completed all the services in her service plan because of her drug addiction. She testified that she did not take advantage of any of the services offered by the Methodist Children's Home when she first placed her children in 2004 because of her drug addiction. Other than the psychological exam, Julie testified she didn't cooperate or follow through on the services the Department asked her to perform. She agreed that her children were with her mother most of the time, her using drugs had an effect on her children, and she wasn't the mother she should have been. She testified her conduct was not in the best interest of her children and she put them at risk. She indicated, since the hearing in June 2006, she had been convicted of possession of methamphetamine and a parole violation. She was incarcerated for two months during which she did not use drugs and was sentenced to probation and Substance Abuse Felony Punishment.

Julie wanted the children to stay with her mother while she finished her sentence. She indicated there was a nineteen week wait for her to get into rehabilitation. She intended to be in rehabilitation for six months, a halfway house for three months, and then

she would find work. Julie testified that her mother had bought a new house because the old one burned. Roonie testified she had terminated her romance with Jim but was still seeing him as a friend.

Constance Priest, the children's current caseworker, testified that she remained concerned the children would still be around Jim if they were placed with Roonie. She indicated that Julie did not work on any of her services other than undergoing the psychological evaluation. Neither did Julie show up for drug screenings although requested and, under the Department's policy, Julie's "no show" was interpreted as a "presumed positive." She testified Julie had not complied with any recommendations based on the psychological evaluation and opined that she was incapable of taking care of the three children.

Priest further indicated Julie's children were placed in a foster home in June 2006. Two of the children (T.H. and T.H.) remain in the foster home while one child (D.H.) was recently placed in a residential treatment center because of aggressive behaviors exhibited toward his foster parents and other children. Priest testified the two children in the foster home were adjusting well and the Department's goal was for their adoption. She also testified that the foster parents have indicated they will adopt them if termination is granted and will also accept D.H. if his behaviors subside.

At the conclusion of the hearing, the trial court found by clear and convincing evidence that Julie had engaged in conduct which endangered the physical or emotional

well-being of each of the children and knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being in the home that was being provided to them. The trial court cited Julie's continued drug use since before their birth until her arrest in November 2006 and her incarceration in the Potter County Jail awaiting drug treatment as factors in support of the decision.

On August 30, 2007, the trial court entered its order of termination and appointed the Department permanent managing conservator of the children. On October 4, 2007, at Julie's request, the trial court issued written Findings of Fact and Conclusions of Law in support of its judgment.

## Discussion

In her first point of error, Julie contends the evidence is factually insufficient to support the trial court's finding that she engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of the children because the Department failed to (1) establish the time frame the children were exposed to conditions at Roonie's house, (2) produce evidence to support the Department's "validation" of child abuse and neglect prior to the children's placement in the Methodist Children's Home, and (3) establish that Julie had specific, timely knowledge that Jim was, in the Department's opinion, a sexual predator or that she was told to keep him away from the children. In her second point of error, Julie contends the Department's evidence is factually insufficient to support the trial court's finding that she

9

engaged in conduct or knowingly placed her children with persons who engaged in conduct which endangered the physical or emotional well-being of her children because (1) her incarceration is for a period of one year, and there is no evidence she could not make appropriate arrangements for the children during that time, (2) her failure to complete the court-ordered service plan alone is not sufficient grounds for termination, (3) although using drugs, she did not do so in front of the children, and (4) the Department failed to establish her acts or omissions had endangered the children.

## I.       Standard of Review

In conducting a factual sufficiency review of a finding in a termination-of-parental-rights proceeding, we consider the entire record including evidence supporting and contradicting the finding and determine whether a fact finder could reasonably form a firm conviction or belief about the truth of the matter on which the State bears the burden of proof. *In re J.F.C.,* 96 S.W.3d 256, 265-66 (Tex. 2002); *In re C.H.*, 89 S.W.3d 17, 25-26 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a reasonable fact finder could not have credited in favor of the finding is so significant that a fact finder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *In re J.F.C.,* 96 S.W.3d at 266.

## II.    Termination of Parental Rights

In proceedings to terminate the parent-child relationship brought under § 161.001 of the Texas Family Code, the Department must establish one or more of the acts or omissions enumerated under subsection (1) of the statute and must also prove that termination is in the best interest of the child.  Tex. Fam. Code Ann. § 161.001 (Vernon 2002);[5] *In re S.M.L.D.,* 150 S.W.3d 754, 756 (Tex.App.–Amarillo 2004, no pet.).  However, while both elements must be established, *Tex. Dep't of Human Services. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987), only one finding under § 161.001(1) is necessary to support a judgment of termination.  *In re W.E.C.,* 110 S.W.3d 231, 239-40 (Tex.App.–Fort Worth 2003, no pet.).

The quantum of proof required in a termination of parental rights proceeding is clear and convincing evidence.  *See* § 161.001; *In re J.F.C.*, 96 S.W.3d at 263, *citing Santosky v. Kramer,* 455 U.S. 745, 746, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982)*.  See also* § 101.007 (defining clear and convincing evidence as "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established"). While the proof must be more than merely the greater weight of the credible evidence, there is no requirement that the evidence be unequivocal or undisputed.  *State v. Addington*, 588 S.W.2d 569, 570 (Tex. 1979).

---

[5]All section references in this opinion are to Texas Family Code Annotated (Vernon 2002).

Here, the trial court found that Julie had knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered the physical or emotional well-being of the children and that she also engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the children's physical or emotional well-being. *See* § 161.001 (1)(D), (E).[6] Both subsections (D) and (E) require proof of endangerment, which means to expose to loss or injury, or to jeopardize a child's emotional or physical health. *Boyd,* 727 S.W.2d at 533. While endangerment means more than a threat of metaphysical injury or the possible ill effects of a less-than-ideal family environment, it is not necessary that the conduct be directed at the child or that the child actually suffer injury. *Doyle v. Texas Dep't Of Protective and Regulatory Services,* 16 S.W.3d 390, 394 (Tex.App.–El Paso 2000, pet. denied).

Subsections (D) and (E) differ in one respect: the source of the physical or emotional endangerment to the child. *See In Interest of B.S.T.*, 977 S.W.2d 481, 484 (Tex.App.–Houston [14th Dist.] 1998, no pet.); *In Interest of S.H.A.*, 728 S.W.2d 73, 83-84 (Tex.App.–Dallas 1987, writ ref'd n.r.e.). Subsection (D) requires a showing that the environment in which the child is placed endangered the child's physical or emotional health. *Doyle*, 16 S.W.3d at 394. This provision addresses the child's surroundings and environment rather than parental misconduct, which is the subject of subsection (E). *Doyle*, 16 S.W.3d at 394; *In Interest of B.S.T.*, 977 S.W.2d at 484; *In Interest of S.H.A.,*

---

[6]Further reference to these subsections of the Family Code will be by reference to "subsection (D)" and/or "(E)."

728 S.W.2d at 84. Under subsection (E), the cause of the danger to the child must be the parent's conduct alone, as evidenced not only by the parent's actions but also by the parent's omission or failure to act. *Doyle*, 16 S.W.3d at 395; *In Interest of B.S.T.*, 977 S.W.2d at 484; *In Interest of S.H.A.*, 728 S.W.2d at 83-84. The law does not require that the child be a victim of abusive conduct before the Department can involuntarily terminate a parent's rights to the child. *In re C.J.F.,* 134 S.W.3d 343, 350 (Tex.App.–Amarillo 2003, no pet.). "Rather, if the evidence shows a course of conduct which has the effect of endangering the emotional well-being of the child, a finding under section 161.001(1)(E) is supportable." *Id.*

## A.     First Point of Error – Environmental Endangerment

Conduct of a parent or another person in the home can create an environment that endangers the physical and emotional well-being of a child as required for termination under subsection (D). *In Interest of W.S.*, 899 S.W.2d 772, 776 (Tex.App.–Fort Worth 1995, no writ); *D.O. v. Texas Dep't Of Human Services*, 851 S.W.2d 351, 354-55 (Tex.App.–Austin 1993, no writ). It is not necessary for the parent to have certain knowledge that an actual injury is occurring; it is enough that the parent was aware of the potential for danger to the child in such environment and disregarded the risk. *In re S.G.S.,* 130 S.W.3d 223, 238 (Tex.App.–Beaumont 2004, no pet.).

Here, there is no question Roonie's residence presented a danger to the children and the risk was disregarded. An inspection by Smith and an Amarillo Fire Captain

13

detected a variety of unsafe conditions rendering the house hazardous and uninhabitable. In fact, Julie testified the children couldn't live there without being in danger and the house was not a safe place. Both Julie and Roonie testified the children lived in the house prior to being placed by Smith in March 2003. Julie also testified that she and her mother had weekend visitation with the children. Hogan, the Department investigator, confirmed that the children had weekend visitations with Julie and Roonie. Smith testified that, in 2006, the children complained of being spanked with a belt by a friend of their mother's and one child complained they were being left alone in Roonie's house. Based upon this evidence, the trial court was entitled to infer that the children were exposed to the dangers in Roonie's house prior to their being placed in 2003, and during weekend visitations with Roonie and/or Julie.

A parent's past actions can be relevant to a termination deliberation. *See In re C.H.,* 89 S.W.3d at 31-32. Although Julie contends misconduct in the distant past is insufficient on its own to support termination, Smith's testimony regarding the children being alone in Roonie's house as recently as 2006 indicates a continuing disregard of the dangers the children were exposed to prior to their placement in March 2003. Thus, in light of this evidence as well as other evidence, a trial court could reasonably conclude that Julie or her mother had created an environment of danger for the children by their continued presence in Roonie's house.

14

There was also sufficient evidence that the Department had "validated" Julie for child abuse and neglect prior to the children's placement in the Methodist Children's Home. In addition to testimony from Department personnel to the effect that the Department was involved prior to the placement, Julie admitted at the hearing that the Department had validated child abuse and neglect in October 2003. However, the record contains no evidence that Julie knowingly exposed the children to Jim. Neither does the record contain evidence she was aware that Jim was, in the Department's opinion, a sexual predator or that her children were prohibited from being in his presence. Accordingly, the evidence regarding Jim is factually insufficient on the issue of endangerment under subsection (D). *See In re J.R.,* 171 S.W.3d 558, 571 (Tex.App.–Houston [14th Dist.] 2005, no pet.).

Nevertheless, in light of the entire record, we find that the trial court could reasonably have found the Department's evidence clear and convincing and formed a firm conviction or belief as to the truth of the allegations sought to be established. Accordingly, we overrule Julie's first point of error.

**B.     Second Point of Error — Endangerment By Parental Act Or Omission**

Drug addiction and its effect on a parent's life and ability to parent may establish an endangering course of conduct. *Toliver v. Texas Dep't of Family and Protective Services,* 217 S.W.3d 85, 98 (Tex.App.–Houston [1st Dist.] 2006, no pet.); *Latham v. Dep't of Family and Protective Services,* 177 S.W.3d 341, 348 (Tex.App.–Houston [1st Dist.] 2005, no pet.);

15

*In re S.M.L.D.*, 150 S.W.3d at 758; *In re R.W.*, 129 S.W.3d 732, 739 (Tex.App.–Fort Worth 2004, pet. denied). This is particularly so where drug addiction is coupled with continuing use even though the parent is aware that his or her parental rights are in jeopardy, *Latham,* 177 S.W.3d at 348, and the parent violates the agreed terms of a service plan. *See id.; Robinson v. Tex. Dep't of Protective & Regulatory Servs.*, 89 S.W.3d 679, 686-87 (Tex.App.–Houston [1st Dist.] 2002, no pet.).

Here, all three conditions are present. Julie used drugs continually since she was fourteen years old. She used drugs both before and after her children's births. When she was around her children, she was using daily and under the influence of methamphetamines. At the final hearing, she agreed that her drug use had an effect on the children, her conduct was not in the children's best interest, and she put them at risk. Moreover, she continued to use drugs and was arrested for possession of methamphetamines after the termination proceedings were initiated, failed to show up for drug screenings, and violated the agreed terms of her service plan.

During the past ten years of drug use, Julie has done little or nothing to assume, or prepare herself for, the responsibilities associated with parenthood. When she voluntarily placed her children with the Methodist Children's Home, she was offered inpatient and outpatient drug and alcohol treatment but did not take advantage of the offer. Throughout the Methodist Children's Home placement from 2004 to 2006, she continued to use drugs and was under their influence during visitations with her children. When termination

16

proceedings were initiated in 2006, she was given a second chance. She agreed to a court-ordered service plan requiring that she undergo a psychological evaluation and counseling. She also agreed to adhere to her therapist's recommendations which included drug testing, intensive outpatient substance abuse treatment, daily attendance in a twelve-step program, individual therapy, parenting classes, anger management counseling, obtaining a GED, and employment. Again, Julie did nothing to comply except undergo the psychological evaluation and continued using drugs until her arrest and incarceration.

While neither her incarceration nor failure to complete her court-ordered service plan alone may be sufficient for a finding of endangerment, both may be considered to determine whether Julie engaged in an endangering course of conduct. *See Boyd,* 727 S.W.2d at 533; *In re C.J.F.,* 134 S.W.3d at 353 (incarceration is a factor properly considered on the issue of endangering); *Robinson*, 89 S.W.3d at 686-87 (service plan violation also a factor). In addition, her failure to appear for drug screening is also an indication that she was using drugs while her parental rights were in jeopardy. *In re W.E.C.,* 110 S.W.3d at 239.

That Julie did not take drugs in front of her children is of no avail. *See In re K.M.B.,* 91 S.W.3d 18, 25 (Tex.App.–Fort Worth 2002, no pet.). When she was around the children, she was under the influence of drugs. Although Julie testified to her current intent to enter a drug rehabilitation program, her attendance in this program is required by her criminal sentence and there are no assurances, nor can there be, that once she completes

17

the program she will be a sober and responsible mother to these children. Given her long history of dependency and her inability to recognize her need for treatment, the trial court was entitled to infer that her substance abuse and mental health issues would continue and further jeopardize the children's well-being.

Her implication that the Department is required to prove she could not make appropriate arrangements for the care of her children while incarcerated completely misses the mark. The children have been well cared for in a foster home since June 2006. Their caseworker testified T.H. and T.H. are adjusting well and stand to be adopted. D.H. is receiving treatment for behavioral issues and stands to return to the foster home if his behaviors subside. While Julie was their care giver, they lived with her mother, her sister, the Methodist Children's Home, a foster home, and now, a second foster home. "The need for permanence is a paramount consideration for the child's present and future physical and emotional needs." *In re C.J.F.,* 134 S.W.3d at 350. The Department has provided sufficient evidence that Julie engaged in endangering conduct. Contrary to her assertions, the Department need not prove Julie's actions were directed at the children or the children *actually* suffered injury. *Boyd,* 727 S.W.2d at 533. The specific danger to a child's well-being may be inferred from parental misconduct. *Toliver*, 217 S.W.3d at 98; *In re C.J.F.,* 134 S.W.3d at 352.

Viewing the evidence before us as a whole, we find there was sufficient clear and convincing evidence to support the trial court's finding that Julie engaged in conduct or

knowingly placed the children with persons who engaged in conduct which endangered the physical or emotional well-being of her children. Julie's second point of error is also overruled.

## CONCLUSION

Having overruled Appellant's points of error, the judgment of the trial court is affirmed.

Patrick A. Pirtle
Justice

19