

In The
Court of Appeals
Seventh District of Texas at Amarillo

No. 07-12-0542-CV

IN THE INTEREST OF A.L.R. AND M.R.R., CHILDREN

On Appeal from the County Court at Law No. 3
Lubbock County, Texas
Trial Court No. 2011-559,484, Honorable Judy C. Parker, Presiding

MAY 13, 2013

MEMORANDUM OPINION

Before QUINN, C.J., and CAMPBELL and HANCOCK, JJ.

Shawn R. (Shawn) appeals the termination of his parental rights to his two children A.L.R. and M.R.R. He contends the evidence is legally and factually insufficient to establish the statutory grounds for termination and that termination is in the best interest of the children. We affirm the order.

*Background*

A.L.R. was born on September 13, 2006, and appellant signed an acknowledgment of paternity for her on September 21, 2006. M.R.R. was born on October 19, 2007, to the same mother, but appellant was not adjudicated as the father until May 8, 2012, although he testified at trial that he knew he was the father. The

children's mother worked as a stripper and used drugs and alcohol. Appellant described her drug problem as ten plus on a scale of one to ten. However, he also testified that they used drugs together. He cared for A.L.R. during the first year of her life even though he was using drugs. Beyond that, the only support he provided his children was after he completed SAFEP (a lock-down drug treatment program) and worked at a restaurant from April 2009 to October 2009.

From 2006 to 2009, appellant was incarcerated for a total of eighteen months, which period of incarceration included the day on which his youngest child was born. Moreover, he is currently in prison, has been so imprisoned since October 2009, has a release date in December 2014, and has seen M.R.R. only a couple of times since his birth.

Appellant's criminal convictions include one for aggravated assault with a deadly weapon in 1991 (for which he was placed on probation and had that probation revoked in 1999), one for driving while intoxicated in 2007, one for theft in 2010, and one for assault with serious bodily injury against his sister (the crime for which he is currently imprisoned). And, while imprisoned, he left the children in the care of their mother despite knowing of her "ten plus" drug problem.[1]

Since the birth of the children, Child Protective Services (CPS) has conducted four investigations of their caregivers. The first investigation, in 2008, involved their mother's drug use and their lack of a stable home. It disclosed that she had left the children with her step-grandmother, who was deemed to be a suitable caregiver at the time.

---

[1]Shawn testified he had his sister (whom he was convicted twice of assaulting) intervene at one time and care for the children for several months.

The second investigation occurred in 2010, at a time when the children were again living with their mother. It involved her continuing use of drugs and inability to care for appellant's offspring. At that point, the mother was found to have mental health issues. So too did she test positive for drug use. CPS also experienced difficulty in maintaining contact with her since she often could not be located. This event involved the mother again leaving the children with relatives.

The third investigation occurred in August 2011 and involved the children's then caregivers, a step-grandmother and her husband, who allegedly were drinking heavily and abusive to the children. A neighbor was told by four-year-old A.L.R. that the grandmother had pushed her out of a car late at night after the child had walked to the neighbor's house for help. The grandmother then left the children with acquaintances who became the intervenors at bar, that is, William Kirk and Kathryn Lee Carlisle.

Upon arrival at the home of the Carlisles, the children were found to be bruised. Later, their mother signed a document allowing the children to remain with the Carlisles. The CPS investigation resulted in finding that the Carlisle home was suitable and that the children were doing well there.

### *Authority*

We review the trial court's decision under the standard discussed in *In re J.F.C.,* 96 S.W.3d 256, 266-67 (Tex. 2002) and *In re C.H.,* 89 S.W.3d 17, 25 (Tex. 2002) to which we refer the parties. The trial court found that termination was warranted under §§ 161.001(1)(D) and (E) of the Family Code and that termination was in the children's best interest. Evidence of only one statutory ground is needed to support that decision. *In re K.C.B.,* 280 S.W.3d 888, 894-95 (Tex. App.–Amarillo 2009, pet. denied), and the

ground we direct our attention to concerns appellant engaging in conduct or knowingly placing the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children. TEX. FAM. CODE ANN. § 161.001(1)(E) (West Supp. 2012).

For purposes of addressing this appeal, we also recall several other legal rules. First, conduct of the parent undertaken before and after a child's birth is relevant in assessing whether a particular child has been endangered.[2] *In re S.M.L.D.,* 150 S.W.3d 754, 757 (Tex. App.–Amarillo 2004, no pet.). Second, the use of drugs is an indicia of endangerment, *see In re J.O.A.,* 283 S.W.3d 336, 345-46 (Tex. 2009), as is intentional criminal activity that exposes a parent to incarceration. *In re C.A.B.,* 289 S.W.3d 886, 874 (Tex. App.–Houston [14th Dist.] 2009, no pet.); *see also Avery v. State,* 963 S.W.2d 550, 553 (Tex. App.–Houston [1st Dist.] 1997, no writ) (finding that a parent's past criminal conduct before and after the child's birth is relevant in a termination proceeding).

Shawn used drugs while caring for A.L.R. and admitted that he was incapacitated while doing so. He further engaged in criminal activity that caused him to be unable to care for his children and left them in the care of their mother who he knew had a serious drug problem and was unstable. He justified his decision by thinking she would "try and pull it together." Moreover, some of Shawn's criminal activity involved violence by him toward a family member. He also left his children with others who could or would not

---

[2]Shawn argues the court should not consider evidence of his conduct prior to a determination of his paternity of M.R.R. However, his conduct directed at other children such as A.L.R. may be considered. *See In re J.O.A.,* 283 S.W.3d 336, 345 (Tex. 2009). Moreover, Shawn testified at trial that he knew M.R.R. was his child. We know of no authority allowing a parent to disregard his parental duties owed those he knew were his children simply because no court adjudicated them to be his children. More importantly, the mindset implicit in a parent's effort to urge such a position is quite telling. One who knows a child is his but attempts to avoid his legal obligations to that child simply because the child had yet to be adjudicated his blood lacks something in the parent quotient.

4

care for them and abused them. This is both legally and factually sufficient evidence supporting the conclusion that Shawn engaged in conduct or knowingly placed the children with persons who engaged in conduct that endangered the physical or emotional well-being of the children.

That Shawn also contends that he was unaware of the location of his children and was deprived of the opportunity to "protect" them is of no controlling moment. He placed himself in the position of being incarcerated and therefore removed from their life, or at least the factfinder could have so legitimately concluded. He also cited us to nothing of record illustrating the effort, if any, he undertook to remain in contact with, know of the condition of his children, or discover their location if he truly did not know it.

*Best Interests of the Child*

As for the best interests of the children, we consider the *Holley* factors. They include, among other things, 1) the desires of the children, 2) the emotional and physical needs of the children now and in the future, 3) the emotional and physical danger to the child now and in the future, 4) the parental abilities of the individuals seeking custody, 5) the programs available to assist those individuals to promote the best interest of the child, 6) the plans for the child by those individuals or by the agency seeking custody, 7) the stability of the home, 8) the acts or omissions of the parent indicating that the existing parent/child relationship is not a proper one, and 9) any excuse for the act or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976); In *re P.E.W.*, 105 S.W.3d 771, 779-80 (Tex. App.–Amarillo 2003, no pet.). It is not necessary that each factor favor termination, *In re P.E.W.,* 105 S.W.3d at 790, and the list is not exclusive. *In re C.J.F.,* 134 S.W.3d 343, 354 (Tex. App.–Amarillo

2003, pet. denied). Moreover, the same evidence illustrating the presence of statutory grounds for termination may also be probative of the child's best interest. *In re C.H.,* 89 S.W.3d at 28.

A rational factfinder had evidence before it from which it could conclude that Shawn had no viable plan for the caretaking of the children. Again, he requested that they be left in the temporary custody of his paternal uncle, that is, a person who had never met the children, did not know that Shawn was twice convicted for assaulting his sister, had not communicated with Shawn for six years, and sent the children only one gift card on their birthday. And, though Shawn professed a willngness and desire to care for the children when he was freed from prison, his representation lacked detail sufficient to depict that it was founded on thought or practicality. To that, the factfinder had before it Shawn's own track record. It could look to that record to gauge the viability of his plans and goals.

On the other hand, the Carlisles, who want to adopt the children, have been married for twenty-four years, are well-employed, and have two children of their own. One of those children lives at home and is bonded with A.L.R. and M.R.R. The latter also have lived with the Carlisles since August 2011, and their caretakers have received no monetary support from Shawn or others while effectuating that endeavor.

When the children first arrived at the Carlisle house, they were insecure, afraid of being left, and afraid of men. They now are happy and interact with Kathryn's male relatives. They have never inquired about their mother or step-grandmother and express anxiety about being taken away from the Carlisles. That anxiety manifests

itself by A.L.R. hiding under the bed when Kathryn goes to work, and M.R.R. crying and saying he thought Kathryn would be gone forever.

The superintendent of the Anton Independent School District also testified that the Carlisles are involved in school activities and have happy children. The foregoing is legally and factually sufficient evidence upon which a factfinder could conclude that termination of the parental relationship was in the best interests of the children.

Accordingly, the order is affirmed.


Per Curiam