Opinion issued January 13, 2011



In The

Court of
Appeals

For The

First District
of Texas

————————————

NO. 01-10-00415-CV

———————————

In the Interest of B.H., a child



 



 

On Appeal from the 306th District Court

Galveston County, Texas



Trial Court Case No. 08CP0096

 



 

MEMORANDUM OPINION ON
REHEARING

          This
is a parental termination case.  After a
jury trial, J.H.’s parental rights to B.H. were terminated.  See Tex. Fam. Code Ann. § 161.001 (Vernon
Supp. 2010). In three issues, J.H., to whom this opinion refers as the
“father,” contends that the evidence was legally and factually insufficient to
support the jury’s verdict of termination.

This Court issued an opinion in
which we held that the father had not preserved error for appeal.  The father filed a motion for en banc
reconsideration, directing our attention to his statement of appellate
points.  We grant rehearing on our own
motion, withdraw our opinion and judgment issued November 10, 2010, and issue
the following in their stead.  In light
of the memorandum opinion on rehearing, the father’s motion for en banc
reconsideration is moot, and we dismiss it.

Because we conclude that the
evidence, including extensive evidence that the father killed B.H.’s infant
brother, was legally and factually sufficient to support the jury’s verdict, we
affirm.

I.                 
Background

Appellant J.H. is the biological father
of his daughter, B.H., and a son, J.H., Jr.  The biological mother of both children is J.T.  Collectively, this opinion refers to J.H. and
J.T. as the “parents” and to B.H. and J.H., Jr. as the “children.”  The parents and their children shared a
bedroom.  The children’s maternal grandmother
testified that appellant was a good father who fed B.H. and played with
her.  She also said that she had known the
father to be violent and to question whether he was baby J.H., Jr.’s biological
father.

One evening around 9:00 p.m., B.H.’s
paternal grandparents took her to their house for an overnight visit.  For the rest of the night, six-week-old J.H., Jr.
was alone with his parents in their bedroom. 
The maternal grandmother testified that she left for work the next
morning around 5:30 a.m.  When she left,
she noticed that the parents’ bedroom door was closed, and she saw the father looking
out a window in the closet.  When the
parents awoke, they found their son lying dead in his crib.  The mother’s sister, who slept in the adjoining
bedroom, overheard their excited conversation, went into their bedroom, and
then called the police.  The maternal
grandmother received a call at work and immediately returned home.

Detective C. Beyer and Officers A. Trentman
and M. Trevino of the League City Police Department responded to the home.  Detective Beyer testified that he saw the
deceased infant, who had a fresh-looking cut above his eye in the shape of a
half-crescent.  He looked at the bedroom
and noticed that inside the crib were numerous stuffed animals, a baby bottle,
plush blankets, and a standard-sized pillow on which he saw a small spot of
blood.  Initially, Beyer did not believe
there was any reason to suspect homicide. 
The parents consented to a search of the bedroom.  Officers found 0.12 grams of marijuana hidden
in the crib.  They found no blood on the
carpet or the walls.  There was no blood
on the father.

Later that day, the father gave a
recorded statement to police.  He said
that the mother fed and cared for the baby around 5:00 or 5:30 a.m.  In a second recorded statement, the father
said that he fed and cared for the baby. 
He also told a third version about what happened during the early
morning that day: that he woke up, propped a bottle in the crib for the baby to
drink, and went back to sleep.  However, the
father consistently said that nobody else entered their bedroom between
approximately 5:00 a.m. and 10:30 a.m. that day.  He also admitted that he smoked marijuana the
previous night, a fact that he never recanted. 
The father’s recorded statements were shown to the jury.  When the father was called to testify, he
denied using methamphetamines the night before the baby’s death, but he
otherwise asserted his Fifth Amendment right to remain silent in response to
every other question that was posed to him. 
The maternal grandmother testified that the father had told her that he
thought the baby suffocated and that he did not “do it.”

The medical examiner conducted an
autopsy, which showed that the baby had several fractured ribs (some of which
were fractured two to three days before the baby’s death), a fractured spinal
column, injuries to his head, swelling of the brain, internal hemorrhaging, and
bruises on his torso and thigh.  Some bruises
appeared to be two to three days old. 
The baby was in a clean, dry diaper and had no food in his stomach.  Based on his evaluation of the nature of the
injuries, the medical examiner concluded that the baby’s death was a homicide,
caused by excessive trauma.  At trial,
the medical examiner testified that the injuries were most consistent with
“vigorous shaking” and possibly consistent with some other blunt force
trauma.  For example, as to the internal
bleeding in the baby’s abdomen, the medical examiner testified, “This is
bleeding by shaking or being hit.”  He
also testified that babies’ bones do not break easily, that there was no
evidence of brittle bone disease, that the injuries could not have been caused
by falling down stairs, by CPR, or during childbirth.  The medical examiner opined that the baby
likely died within three hours after being shaken.

By the time of the baby’s funeral, the
father was a suspect in the murder of his son.  D.M., a co-worker of the maternal grandmother,
attended the baby’s funeral.  When D.M.
saw the father standing alone by his son’s casket, she went to him to offer
support.  She testified that the father repeatedly
said, “It’s my fault.  I did it.”  Believing that the baby died from sudden
infant death syndrome, she tried to reassure him that it was not his fault and
to explain what she knew about crib death. 
League City police officers arrested the father at the funeral on
outstanding warrants.  A week later, the
maternal grandmother told D.M. that the baby had been murdered, and D.M.
reported what the father said at the funeral.

The father was deported to Mexico
before he was indicted for capital murder. 
After the deportation, the father contacted the maternal grandmother
both from Mexico and from another location in Texas.  She testified that the father said he feared
for his life due to prevalent gang violence in Mexico and wanted to come
back.  The father also communicated with
his own parents.

The father was charged with capital
murder, rearrested in Harris County, and transferred to Galveston County jail.  While in jail, he befriended another inmate,
Christopher Altizer, who exercised with him in the prison yard on a regular
basis.  Altizer testified that the father
told him he was a member of the Houstone gang. 
As to the baby’s death, Altizer testified that he overheard the father
say “something along the lines that his baby mama did it.”  Altizer also testified that the father “said
that he was on drugs and that his baby wouldn’t stop crying, so he hit it.”  He testified that the father told him he was
high on methamphetamines at the time of the baby’s death.  Altizer was in jail at the time for sexual
assault of a child, and he pleaded guilty to indecency with a child.  He testified that his plea bargain preceded
his disclosure of the father’s statement and that he received no deal or
consideration in exchange for his testimony.

The Department of Family and
Protective Services sought termination of both parents’ rights to their
daughter B.H.  The mother relinquished
her parental rights, but the father did not. 
The Department did not offer any services to the father and did not
contemplate family reunification as a disposition of B.H.’s case.  By the time of trial, B.H. had been living
with her maternal grandparents for more than a year, and the grandparents had
intervened in the termination suit because they wished to adopt her.  In addition to the previously mentioned
witnesses, the jury heard testimony from three employees of Children’s
Protective Services, investigator Karen Coblentz, investigative supervisor
Cheryl Bourda, and conservatorship worker Jack Lawrence.  Coblentz testified that CPS had received a
referral regarding B.H. the month before the baby died.  An anonymous caller informed CPS that while
B.H. was in the care of her father and maternal uncle, she was found hungry and
crying in her crib, in dirty clothes with a diaper full of feces while the
father and the uncle smoked marijuana. 
B.H. was 16 months old at the time. 
Coblentz also testified that the mother’s sister, D.C., who lived in the
same house with her three children, had prior CPS cases of her own.  Bourda testified from an affidavit by David
Henry, a CPS investigator whom she supervised and who could not be present at
trial.  She testified that the father
told Henry that he might have dropped the baby, he might have shaken the baby
to wake him up, and he might have used full hand thrusts while performing CPR
on the baby.  Lawrence testified that he
was familiar with B.H.’s circumstances. 
He thought it would endanger B.H. to return to her father, who had been
indicted for capital murder and that it would further endanger B.H. emotionally
for her father to have killed her brother and to have illegal drugs in her
bedroom.  He testified that he believed
it was in B.H.’s best interest for the father’s paternal rights to be
terminated and for her maternal grandparents to adopt her.

The jury was instructed on two
predicate endangerment elements and the best interest of the child.  The jury concluded that the father’s parental
rights should be terminated.  

II.              
Preservation
of error

The father’s trial counsel timely
filed a notice of appeal, and his appointed appellate counsel filed a statement
of points, which included his challenge to the legal and factual sufficiency of
the evidence.  Therefore, we conclude
that the father has preserved error, and we will address the merits of this
case.  See Tex. Fam. Code Ann.
§ 263.405(b) (Vernon 2008); In re
J.H.G., 302 S.W.3d 304, 306 (Tex. 2010).

III.          
Sufficiency
of the evidence

A.  
Standards
of review

In proceedings to terminate the
parent-child relationship brought under Texas Family Code section 161.001, DFPS
must establish one or more of the acts or omissions enumerated under
section 161.001(1) and that termination is in the best interest of the
child.  Tex.
Fam. Code Ann. § 161.001 (Vernon 2009). 
Both elements must be established, and termination may not be based
solely on the best interest of the child as determined by the trier of
fact.  Tex. Dep’t of Human Servs. v. Boyd, 727 S.W.2d 531, 533 (Tex.
1987).  A trial court’s decision to
terminate parental rights must be supported by clear and convincing
evidence.  In re J.F.C., 96 S.W.3d 256, 263–64 (Tex. 2002); In re V.V., No. 01-08-00345-CV, 2010 WL
2991241, at *4 (Tex. App.—Houston [1st Dist.] July 29, 2010, pet. denied) (en
banc).  “‘Clear and convincing evidence’
means the measure or degree of proof that will produce in the mind of the trier
of fact a firm belief or conviction as to the truth of the allegations sought
to be established.”  Tex. Fam. Code Ann. § 101.007 (Vernon
2008).

“[I]n conducting a legal
sufficiency review in a termination-of-parental-rights case, we must determine
whether the evidence, viewed in the light most favorable to the finding, is
such that the fact finder could reasonably have formed a firm belief or
conviction about the truth of the matter on which the State bore the burden of
proof.”  Cervantes-Peterson v. Tex. Dep’t of Family & Protective Servs.,
221 S.W.3d 244, 249 (Tex. App.—Houston [1st Dist.] 2006, no pet.) (en banc)
(citing J.F.C., 96 S.W.3d at
266).  “In viewing the evidence in the
light most favorable to the judgment, we ‘must assume that the fact finder
resolved disputed facts in favor of its finding if a reasonable fact finder
could [have done] so,’ and we ‘should disregard all evidence that a reasonable
fact finder could have disbelieved or found to have been incredible.’”  Id.
(citing In re J.P.B., 180 S.W.3d 570,
573 (Tex. 2005)).  

“In conducting a factual
sufficiency review in a termination-of-parental-rights case, we must determine
whether, considering the entire record, including both evidence supporting and
evidence contradicting the finding, a fact finder reasonably could have formed
a firm conviction or belief about the truth of the matter on which the State
bore [the] burden of proof.”  Id. (citing J.P.B., 180 S.W.3d at 573; In
re C.H., 89 S.W.3d 17, 25 (Tex. 2002)). 
“We should consider whether the disputed evidence is such that a
reasonable fact finder could not have resolved the disputed evidence in favor
of its finding.”  Id. (citing J.F.C., 96
S.W.3d at 266–67).  “‘If, in light of the
entire record, the disputed evidence that a reasonable fact finder could not
have credited in favor of the finding is so significant that a factfinder could
not reasonably have formed a firm belief or conviction, then the evidence is
factually insufficient.’” Id.
(quoting J.F.C., 96 S.W.3d at 266).

B.   Predicate grounds for termination

The Department sought termination of the father’s parental
rights under paragraphs D and E of
section 161.001(1), both of which describe acts of endangerment.  The jury answered “yes” to the sole question
posed to it, “Should the parental rights of the father . . . be terminated as
to the child [B.H.].”  In its final order
of termination, the trial court expressly found both statutory provisions were
met.  The court found that the father knowingly
placed or knowingly allowed B.H. to remain in conditions or surroundings which
endanger the physical or emotional well-being of B.H.  The court also found that the father engaged
in conduct or knowingly placed B.H. with persons who engaged in conduct which
endangers the physical or emotional well-being of B.H.  See Tex. Fam. Code Ann. § 161.001(1)(D),
(E).  In his first and second issues, the
father challenges the sufficiency of the evidence of these two findings.  However, “[o]nly one predicate finding
under section 161.001(1) is necessary to support a judgment of termination when
there is also a finding that termination is in the child’s best interest.”  In re
A.V., 113 S.W.3d 355, 362 (Tex. 2003). 
Accordingly, we will focus our analysis on subsection (E), under which a parent endangers his child if he has “engaged
in conduct or knowingly placed the child with persons who engaged in conduct
which endangers the physical or emotional well-being of the child.”  See Tex. Fam. Code Ann. § 161.001(1)(E).

“To endanger” means to expose a
child to loss or injury or to jeopardize a child’s emotional or physical
health.  Walker v. Tex. Dep’t of Family & Protective
Servs., 312 S.W.3d 608, 616 (Tex. App.—Houston [1st Dist.] 2009, pet.
denied); Robinson v. Tex. Dep’t of
Protective & Regulatory Servs., 89 S.W.3d 679, 686 (Tex. App.—Houston
[1st Dist.] 2002, no pet.) (citing Boyd,
727 S.W.2d at 533).  The term means “more
than a threat of metaphysical injury or the possible ill effects of a
less-than-ideal family environment.”  Boyd, 727 S.W.2d at 533.  “Rather, ‘endanger’ means to expose to loss
or injury; to jeopardize.”  Id. at 534.  Endangerment may be inferred from parental
misconduct.  Id.  The relevant inquiry is
whether evidence exists that a parental course of conduct endangered the child’s
physical or emotional well-being.  The
conduct does not have to occur in the presence of the child, be directed toward
the child, or cause the child injury.  Walker, 312 S.W.3d at 616–17.  The conduct may occur before the child’s birth
and both before and after the child has been removed by the Department.  Id.
at 617.

1.    
Legal sufficiency

In arguing that the evidence was
legally and factually insufficient to support endangerment under section
161.001(1)(E), the father argues that endangerment cannot be based on a single
act or omission, like the baby’s death, and that the relevant time frame for
determining endangerment is before B.H. was removed.  At trial, the Department introduced evidence
that the father had committed acts of violence, engaged in criminal conduct,
and used illegal drugs.

First, a parent’s abusive and
violent criminal conduct can endanger the well-being of a child, even if such
conduct is directed toward a person other than the child.  Jordan
v. Dossey, No. 01-09-00618-CV, 2010 WL 1948280, at *20 (Tex. App.—Houston [1st
Dist.] May 13, 2010, pet. filed).  Evidence
that a person has engaged in abusive conduct in the past permits an inference
that the person will continue violent behavior in the future.  Id.;
accord Walker, 312 S.W.3d at
617.  Most of the testimony at trial
centered on the violent death of baby J.H., Jr., who was alone in a room with
only the parents the night that he died. 
The medical examiner testified that his autopsy showed evidence that the
baby had non-accidental injuries that preceded his death by several days.  Altizer testified that the father confessed
to having punched and killed his son. 
D.M. testified that the father repeatedly said, “I did it.  It’s my fault,” at his son’s funeral.  In addition, the maternal grandmother
testified that she had known the father to be violent, and Altizer testified
that the father told him he belonged to the notorious Houstone gang.  Based on this evidence, the jury could have
formed a firm belief or conviction that the father had a history of violent and
abusive conduct.

Second, because children need
stability and permanence, “conduct that subjects a child to life of uncertainty
and instability endangers the child’s physical and emotional well-being.”  Jordan,
2010 WL 1948280, at *19.  Thus, intentional
criminal conduct that exposes a parent to incarceration is relevant to a
factfinder’s determination of endangerment. See
Boyd, 727 S.W.2d at 533; Avery v.
State, 963 S.W.2d 550, 553 (Tex. App.—Houston [1st Dist.] 1997, no writ); see also In re J.T.G., 121 S.W.3d 117,
133 (Tex. App.—Fort Worth 2003, no pet.); In
re S.F., 32 S.W.3d 318, 322 (Tex. App.—San Antonio 2000, no pet.).  At trial, the Department introduced evidence
that the father had been charged with capital murder in relation to the baby’s
death, and that he had possessed and used illegal drugs.  

Third, because it exposes the child
to the possibility that the parent may be impaired or imprisoned, illegal drug
use may support termination under section 161.001(1)(E).  Walker,
312 S.W.3d at 617–18; see Vasquez v. Tex.
Dep’t of Protective & Regulatory Servs., 190 S.W.3d 189, 195–96 (Tex. App.—Houston
[1st Dist.] 2005, pet. denied) (terminating parental rights despite there being
no direct evidence of parent’s continued drug use actually injuring child).  Evidence of narcotics use and its effect on a
parent’s life and ability to parent may establish that the parent has engaged
in an endangering course of conduct.  Walker, 312 S.W.3d at 618.  In his police interview, the father admitted
that he smoked marijuana the night before the baby died and that he kept
marijuana in the room he shared with his young children.  Altizer testified that the father told him he
was high on methamphetamines when he killed the baby.  And Coblentz testified that the Department
had received an earlier report that the father was neglecting B.H. while
smoking marijuana.

Viewing the evidence in the light
most favorable to the verdict, we conclude that the jury could have formed a
firm belief or conviction that the father had engaged in conduct that endangers
the physical or emotional well-being of the B.H.

2.    
Factual sufficiency

As to the factual sufficiency of
the evidence, we must consider whether the disputed evidence is such that the
jury could not have resolved that disputed evidence in favor of its finding.  See J.F.C.,
96 S.W.3d at 266.  The father points to
conflicts in the evidence and the absence of evidence to support his argument
that the evidence is insufficient to support termination on this ground.

With respect to the death of his
son, the father points to his statement to Altizer implicating the mother in
the baby’s death and his repeated denials of having harmed his son in the
recorded interviews he gave to police investigators.  However, at trial he invoked his right to
remain silent when asked a series of questions about what happened to the baby
and about his drug use.   The Department
points out that in a civil case, a jury may make reasonable inferences from a
party’s assertion of the privilege against self-incrimination.  See
Lozano v. Lozano, 52 S.W.3d 141, 150 (Tex. 2001); In re C.J.F., 134 S.W.3d 343, 352–53 (Tex. App.—Amarillo 2003, pet.
denied) (applying Lozano in
parental-rights-termination case).

The father also argues that the
maternal grandmother testified that he was a good parent to B.H. because he fed
her and played with her, that there was no evidence that he was in an abusive
relationship with the mother, and that there was no evidence that his parenting
skills were impaired by his use of marijuana.

It was within the jury’s province
to resolve conflicts in the evidence, and in light of the entire record, we
cannot say that the evidence emphasized by the father on appeal is so
significant that a jury could not reasonably have formed a firm belief or
conviction that the father engaged in a course of conduct that endangered
B.H.  See
J.F.C., 96 S.W.3d at 266. 

Accordingly, we conclude that the
evidence was legally and factually sufficient to support the jury’s finding
that the father endangered B.H.  See Tex.
Fam. Code Ann. § 161.001(1)(E). 
We overrule the father’s second issue, and in light of this disposition,
we need not address his first issue, regarding endangerment under section
161.001(1)(D).  See A.V., 113 S.W.3d at 362. (“Only one
predicate finding under section 161.001(1) is necessary to support a judgment
of termination when there is also a finding that termination is in the child’s
best interest.”).

C.   Best interest of the child

In his third issue, the father contends
that the evidence was legally and factually insufficient to support the jury’s
conclusion that termination was in B.H.’s best interest because the maternal
grandmother testified that he was a good father and because the baby died in
the maternal grandparents’ home and, therefore they were, at least in part,
responsible for his death.

In determining whether sufficient
evidence showed that termination of the father’s parental rights was in the
children’s best interest, we may consider several factors including
(1) the children’s desires, (2) the current and future physical and
emotional needs of the children, (3) the current and future physical
danger to the children, (4) the parental abilities of the person seeking
custody, (5) whether programs are available to assist the person seeking
custody in promoting the best interests of the children, (6) plans for the
children by the person seeking custody, (7) the stability of the home, (8) acts
or omissions of the parent that may indicate that the parent-child relationship
is not proper, and (9) any excuse for acts or omissions of the parent.  Holley
v. Adams, 544 S.W.2d 367, 371–72 (Tex. 1976); V.V., 2010 WL 2991241, at *7.  The Holley
factors are not exhaustive, and there is no requirement that DFPS prove all
factors as a condition precedent to parental termination.  See In
re C.H., 89 S.W.3d 17, 27 (Tex. 2002). 
“Undisputed evidence of just one factor may be sufficient in a
particular case to support a finding that termination is in the best interest
of the child, but the presence of scant evidence relevant to each Holley factor will not support such a
finding.”  Id.  Moreover, there is a
strong presumption that the best interest of the child is served by keeping
custody in the natural parent.  Id. 


There was evidence at trial to
support findings of emotional and physical danger to the child now and in the
future, as well as acts or omissions of the father indicating the existing
parent-child relationship is not proper. 
See Holley, 544 S.W.2d at 371–72.  CPS worker Jack Lawrence testified by
affidavit that he was familiar with B.H. and that she would be physically and
emotionally endangered if she returned to her father, who had been indicted for
the capital murder of her brother.  He
also testified that it would endanger her for her father to have illegal drugs
in her bedroom.  He also believed it was
in B.H.’s best interest for her father’s paternal rights to be terminated and
for her maternal grandparents to adopt her. 
In addition, for nearly a year and a half before trial, the father made
no attempt to regain contact with B.H. 
He did not contact the Department to inquire about her well-being.

Morever, there was evidence at
trial about the the parental abilities of the individuals seeking custody and
their plans for the child.  See Holley, 544 S.W.2d at 371–72.  At the time of trial, B.H. was in the care of
her maternal grandparents.  The maternal
grandmother testified that she wanted to adopt B.H. and that she thought that
termination of the father’s parental rights was in B.H.’s best interest.  She said that her adult children and her
other grandchildren no longer lived with her and would not live with her in the
future.  She testified that she would
abide by any court order requiring her to keep the mother away from B.H.  She testified that she plans for B.H. to get
an education, go to college, and “be what she wants to be.”

          The
father’s argument that B.H.’s adoption by her maternal grandparents is not in
her best interest because they bear some responsibility for the baby’s death is
unpersuasive in light of the evidence from which a reasonable jury could have concluded
either that the father killed his son or that he failed to protect him.  See
City of Keller v. Wilson, 168 S.W.3d 802, 819 (Tex. 2005) (holding that
jury is sole judge of credibility of witnesses and resolves conflicting
evidence).  Having reviewed all the
evidence, we conclude that the jury could have formed a firm belief or
conviction that termination of the father’s parental rights was in B.H.’s best
interest.  See id.  In addition, we
conclude that any contrary or disputed evidence was not so significant as to
outweigh such a conclusion.  We hold that
the evidence is legally and factually sufficient to support the jury’s verdict,
and we overrule the father’s third issue.

CONCLUSION

          We affirm the judgment of the trial
court.

 

 

 

                                                                   Michael
Massengale

                                                                   Justice


 

Panel consists of Chief Justice
Radack and Justices Massengale and Nuchia.[*]








 











[*]           The Honorable Sam Nuchia, Senior
Justice, Court of Appeals for the First District of Texas, participating by
assignment.