

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-17-00183-CV

**IN THE INTEREST OF J.M.L.**, J.L.B., E.L., R.M.B., and M.E.L., Children

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2014-PA-02870
Honorable Charles E. Montemayor, Judge Presiding

Opinion by: Sandee Bryan Marion, Chief Justice

Sitting: Sandee Bryan Marion, Chief Justice
Marialyn Barnard, Justice
Luz Elena D. Chapa, Justice

Delivered and Filed: August 2, 2017

AFFIRMED

S.B., the mother of J.M.L, J.L.B., E.L., R.M.B., and M.E.L., and J.T., the father of E.L. and R.M.B., appeal the trial court's order terminating their parental rights.[1] S.B. and J.T. both contend the evidence is insufficient to support the trial court's finding that termination of their parental rights was in the best interest of the children. We affirm the trial court's order.

## BACKGROUND

The children were removed from the care of S.B. and J.L. in December of 2014. Although the children were returned to their mother and J.L. in August of 2015, the children were removed for a second time in December of 2015. A bench trial was started on May 19, 2016; however, after

---

[1] The parental rights of J.L., the father of J.M.L., J.L.B., and M.E.L., were also terminated; however, J.L. did not file a notice of appeal and is not a party to this appeal.

the trial court called the case for trial, the attorney representing J.L. and J.T. requested to withdraw because of a conflict in representing both fathers. The trial court granted the request and appointed new attorneys to represent J.L. and J.T. The trial court then recessed the case to allow the new attorneys to familiarize themselves with the case.

Trial resumed on December 9, 2016. At that time, J.M.L. was ten, J.L.B. was nine, E.L. was seven, R.B.M. was six, and M.E.L. was almost four. When trial resumed, J.T. was present; however, neither S.B. nor J.L. appeared at trial. At the conclusion of the evidence, the trial court terminated the parents' rights and signed the order of termination on March 9, 2017.

At trial, Penny Robertson, the children's therapist, testified she began working with the children in July of 2016. During a therapy session on October 13, 2016, the youngest child, M.E.L., made an outcry, stating J.L. hit her on her private parts and slapped her in the face. M.E.L. stated S.B. was in the room when this abuse occurred. When the children were asked to draw a picture of their family, the two oldest children drew the five siblings together, while the two youngest children included the five siblings and their foster mother and father. None of the children included any of their biological parents in their pictures. R.M.B. told Robertson his visits with J.T. were "good." Robertson had not observed any interaction between J.T. and R.M.B. or E.L. and was not in a position to make any recommendation regarding the termination of J.T.'s parental rights. Robertson also had not observed any interaction between S.B. and the children.

Angelica Herrington, J.T.'s parole officer, testified J.T. was incarcerated in Colorado for robbery before being released on parole. Herrington did not remember when J.T. came to Texas. As a condition of parole, J.T. was required to submit to drug testing. Herrington testified J.T. tested positive for marijuana in July, August, and September of 2016. After the first positive test, J.T. was sent to a three-month treatment program. Herrington could not recall if J.T. completed

that program. In response to whether Herrington sent J.T. to "anything else after he came up positive the second or third time," Herrington testified J.T. was still under the initial treatment program when he tested positive the second and third time. In response to Herrington's questions, J.T. admitted to using marijuana one time but stated the other positive tests were from being around coworkers. Herrington told J.T. he needed to remove himself from the situation if his coworkers were using drugs around him; however, Herrington stated J.T. did not make any changes as far as she knew. Herrington stated J.T. complied with all of the other conditions of his parole. Herrington stopped monitoring J.T. in October of 2016. J.T. was scheduled to be released from parole on March 15, 2017.

Leonor Delgado, an elementary school counselor, worked with the children from August of 2015 to November of 2015, and had concerns about their academic progress. Although J.M.L. should have been in the fourth or fifth grade, she was placed in the third grade and was behind in that grade. The children's parents never attended any parent-teacher conferences.

Virginia Rodriguez, an investigator for the Department, testified she investigated an intake referral in December of 2015 after J.M.L. made an outcry stating J.L. sexually abused her. During the investigation, J.M.L. told Rodriguez that J.L. had been touching her for five years under her bra and panties and that he was also touching E.L. When Rodriguez interviewed S.B., S.B. stated she knew J.L. was touching J.M.L. but did not know he was touching E.L. At the conclusion of her investigation, Rodriguez validated the abuse.

J.T. testified he was incarcerated for robbery in Colorado when the Department removed the children in December of 2014. J.T. was sentenced to three years' incarceration followed by three years' of parole. J.T. testified he was serving his last month of parole. J.T. acknowledged the Department had concerns about his drug use and admitted he tested positive for drugs in

September of 2016 when he was tested by the Department. J.T. denied using marijuana in July but admitted using it in August because his girlfriend had suffered a miscarriage. J.T. asserted the other positive drug tests were due to secondhand smoke from being around his coworkers. J.T. was first incarcerated in 2011 and learned about E.L. being molested in October or November of 2015. At that time, J.T. was on the run but tried to get his children out of Texas. J.T. admitted he never made a report to the police regarding the abuse. J.T. had been living with his mother since being released on parole. After being released, J.T. planned to get a better job and move into a house behind a friend's house. When he was asked for the address of the house, J.T. responded, "I couldn't tell you that shit off of my head. I know it's on — off Finch, but I don't know the number." When asked to describe the house, J.T. stated it has water and two bedrooms. J.T. was planning to sleep in the living room so E.L. and R.M.B. would each have their own room. J.T. testified he took care of his children for six months "[l]ast year when [he] was on the run," and bought them school supplies, school pictures, food, and everything else they needed. J.T. admitted the children were not in his care full time, and the last time the children were in his care full time was in 2010. J.T. stated he was on the run for the same robbery charges and also admitted he had a charge pending against him in 2011 for possession of cocaine. Although he was raised around drugs, J.T. testified he broke free of drug issues in 2002 when he joined the Marines and served for three years. Since May of 2016, J.T. had visited his children twice a month and said the visits went "really good." Acknowledging all of the children were bonded, J.T. testified he was willing to take all of the children.

On cross-examination, J.T. stated he had not moved into the house on Finch Road because he only wanted a two-bedroom house if he received custody of the children. J.T. testified his

former caseworker was aware he wanted custody of all of the children. J.T. stated his last drug test for parole was the day before the trial, and the test results were negative.

Alyssa Cordova, the Department's current legal worker on the case, testified J.T. had not completed his service plan. When J.T. was released from incarceration and placed on parole, everything was in place to allow him to finish his service plan. J.T. had not finished his therapy, and the therapist had not seen J.T. for the past two months. J.T. told Cordova he had been unable to reach the therapist. J.T. also tested positive on his drug tests. J.T. told Cordova the positive tests were due to secondhand smoke, but Cordova did not believe him. Cordova testified J.T. was living with his mother, and her home would not be an appropriate placement for the children because his mother's parental rights were terminated based on her serious history with the Department. Although J.T. understood his mother's home was not appropriate, J.T. never provided Cordova with alternative living arrangements, and she first heard of the house on Finch during J.T.'s trial testimony. Cordova did not believe J.T. had a safe and stable home for the children and was not aware of any support system J.T. had for the children. Cordova testified a support system was important since the children would need care while J.T. worked. When Cordova questioned J.T. about the reason he failed to protect his children when he heard about the abuse, he told her he did not want to jeopardize his freedom while he was on the run.

With regard to S.B., Cordova testified S.B. also had not completed her service plan. S.B. had been living in Colorado for the last several months preceding trial. S.B. had alternated between wanting to relinquish her rights and wanting to work her services. S.B. had not visited with the children for several months. In August of 2016, S.B. asked to speak with the children by telephone to tell them goodbye. Cordova believed S.B. was living with her mother which was not a safe and stable home because her mother had a significant history with the Department and her parental

rights were terminated. After the children were reunified with S.B. and J.L., Cordova received a voicemail from S.B.'s phone. In the voicemail, she heard S.B. and J.L. yelling at each other. S.B. told J.L. he needed to stop "jacking off to little kids' pictures" and "going into [J.M.L.'s] room." Cordova believed one of the children had called her number to record what was happening on voicemail. After Cordova removed the children the second time, S.B. told Cordova she had pictures of abuse J.L. had inflicted on J.M.L. and E.L. While the case was pending, Cordova testified S.B. admitted she had issues with drugs, particularly methamphetamines, when she was stressed out.

Cordova testified J.M.L. and J.L.B. have special needs, including math and reading disorders and dyslexia. J.M.L. also has depression disorder, and J.L.B. has adjustment disorder. E.L. and R.M.B. were very behind in school because of their parents' failure to work with them. Cordova stated that if the parents' rights were terminated, the Department's plan was for Claudia L., their current placement and a previous CASA volunteer on the case, to adopt them. The children had been placed with Claudia since June 24, 2016, and were doing amazingly well. The children were happier, and Cordova believed they wanted to stay with Claudia.

Claudia testified she was the CASA volunteer on the case for eight months before all of the children were placed in her care. Claudia decided to be removed as the CASA volunteer and become the children's foster mother because she saw how bonded the children were to each other and she did not want the children to be split up. Claudia testified regarding the children's improvement in school since being placed in her care. The children have told Claudia and her husband that they feel safe in their home and write letters to them thanking them for food, shelter, and a place to sleep. After being placed in her care, the children told Claudia about instances in which they were subjected to physical or emotional abuse by their parents. During the time she

served as the children's CASA volunteer, Claudia described her visits to S.B. and J.L.'s home as chaotic. The children were hungry, and M.E.L. was totally naked in bed on one visit. Claudia stated the children do not ask about their parents. E.L. and R.M.B. are not upset when their visits with J.T. end. Instead, they are ready to go home.

On rebuttal, J.T. testified he informed Cordova about his plan to move into a two-bedroom house in August of 2016. J.T. stated he had difficulty contacting Cordova and his therapist.

## STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Code, the Department has the burden to prove: (1) one of the predicate grounds in subsection 161.001(b)(1); and (2) that termination is in the best interest of the child. *See* TEX. FAM. CODE ANN. § 161.001 (West Supp. 2016); *In re A.V.*, 113 S.W.3d 355, 362 (Tex. 2003). The applicable burden of proof is the clear and convincing standard. TEX. FAM. CODE ANN. § 161.206(a) (West 2014); *In re J.F.C.*, 96 S.W.3d 256, 263 (Tex. 2002). "'Clear and convincing evidence' means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE ANN. § 101.007.

In reviewing the legal sufficiency of the evidence to support the termination of parental rights, the court must "look at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.F.C.*, 96 S.W.3d at 266. "[A] reviewing court must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do so." *Id*. "A corollary to this requirement is that a court should disregard all evidence that a reasonable factfinder could have disbelieved or found to have been incredible." *Id*.

In conducting a factual sufficiency review of a trial court's order terminating parental rights, we "must give due consideration to evidence that the factfinder could reasonably have found to be clear and convincing." *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002). "In reviewing termination findings for factual sufficiency, a court of appeals must give due deference to a [factfinder's] factfindings and should not supplant the [factfinder's] judgment with its own." *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006) (internal citations omitted). The evidence is only factually insufficient if "the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction" about the truth of the State's allegations. *In re J.F.C.*, 96 S.W.3d at 266. "The trial court is the sole judge of the weight and credibility of the evidence, including the testimony of the Department's witnesses." *In re F.M.*, No. 04-16-00516-CV, 2017 WL 393610, at *4 (Tex. App.—San Antonio Jan. 30, 2017, no pet.) (mem. op.).

## PREDICATE FINDINGS

Neither S.B. nor J.T challenge the sufficiency of the evidence to support the predicate statutory grounds for terminating their parental rights. Evidence that proves one or more statutory grounds for termination may constitute evidence illustrating that termination is in the child's best interest. *In re C.H.*, 89 S.W.3d 17, 28 (Tex. 2002).

The trial court found by clear and convincing evidence that S.B.: (1) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; (2) engaged in conduct or knowingly placed the children with persons who engaged in conduct which endangered their physical or emotional well-being; (3) constructively abandoned the children; and (4) failed to comply with the provisions of a court order specifically establishing the actions necessary for her to obtain the return of the children.

The trial court also found by clear and convincing evidence that J.T.: (1) constructively abandoned the children; (2) knowingly placed or knowingly allowed the children to remain in conditions or surroundings which endangered their physical or emotional well-being; (3) failed to comply with the provisions of a court order specifically establishing the actions necessary for him to obtain the return of the children; and (4) used a controlled substance in a manner that endangered the health or safety of the children, and (a) failed to complete a court-ordered substance abuse treatment program; or (b) after completion of a court-ordered substance abuse treatment program continued to abuse a controlled substance.

## BEST INTEREST FINDING

There is a strong presumption that keeping a child with a parent is in the child's best interest. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). However, when the court considers factors related to the best interest of the child, "the prompt and permanent placement of the child in a safe environment is presumed to be in the child's best interest." TEX. FAM. CODE ANN. § 263.307(a) (West Supp. 2016).

In determining the best interest of a child, courts apply the non-exhaustive *Holley* factors to shape their analysis. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976). Those factors include: (1) the desires of the child; (2) the present and future emotional and physical needs of the child; (3) the present and future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the best interest of the child; (6) the plans held by the individuals seeking custody of the child; (7) the stability of the home of the parent and the individuals seeking custody; (8) the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Id*.

The foregoing factors are not exhaustive, and "[t]he absence of evidence about some of [the factors] would not preclude a factfinder from reasonably forming a strong conviction or belief that termination is in the child's best interest." *In re C.H.*, 89 S.W.3d at 27. "A best-interest analysis may consider circumstantial evidence, subjective factors, and the totality of the evidence as well as the direct evidence." *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). "A trier of fact may measure a parent's future conduct by his past conduct [in] determin[ing] whether termination of parental rights is in the child's best interest." *Id*.

A.      Termination of J.T.'s Rights to E.L. and R.M.B.

E.L. and R.M.B are too young to express their desires. However, Claudia testified the children never asked about J.T. before he started visiting them and are not upset when their visits with J.T. end.

E.L. and R.M.B. are behind in school and need additional assistance. Since being placed in Claudia's care, the children have shown significant progress in school. J.T. has not cared for the children on a full time basis since 2010 and failed to complete his service plan. *See In re S.B.*, 207 S.W.3d 877, 887-88 (Tex. App.—Fort Worth 2006, no pet.) (noting failure to comply with family service plan supports a finding that termination is in the best interest of the child).

J.T. tested positive for drug use in three consecutive months presenting a danger to the children. *See In re L.G.R.*, 498 S.W.3d 195, 204 (Tex. App.—Houston [14th Dist.] 2016, pet. denied) (noting parent's drug use supports a finding that termination is in best interest of the child). Although J.T. was aware E.L. was being sexually abused, he did not report the abuse to the police. Cordova testified J.T. failed to take any action because he did not want to jeopardize his freedom while he was on the run from authorities. *See In re C.J.F.*, 134 S.W.3d 343, 354 (Tex. App.—

Amarillo 2003, pet. denied) (relying on evidence of parent's failure to protect child from abuse as evidence to support finding that termination was in child's best interest).

J.T. is living in his mother's home which is not stable or safe. *See In re S.B.*, 207 S.W.3d at 887-88 (noting parent's inability to provide a stable home supports a finding that termination is in the best interest of the child). Although J.T. testified about his plan to move into a two-bedroom house, he could not provide the address of the house, and Cordova stated he never mentioned the house to her. Claudia has provided the children with a stable home in which they feel safe.

E.L. was born in 2009, and R.M.B. was born in 2010. J.T. was incarcerated for three years beginning in 2011. *See In re S.R.*, 452 S.W.3d 351, 370 (Tex. App.—Houston [14th Dist.] 2014, pet. denied) (relying on periods of parent's incarceration while proceedings were pending as evidence to support best interest finding). As previously mentioned, J.T. continues to test positive for drug use and failed to protect E.L. after learning she was being sexually abused. These acts and omissions indicate a parent-child relationship between the children and J.T. is not a proper one.

Having reviewed the record, we hold the evidence is sufficient to support the trial court's finding that termination of J.T.'s parental rights was in E.L.'s and R.M.B.'s best interest.

B.     Termination of S.B.'s Rights

The children have not expressed a desire; however, they have expressed that they feel safe and cared for in Claudia's home. They do not ask about S.B. who had not visited the children in several months. *See In re J.A.W.*, No. 06-09-00068-CV, 2010 WL 1236432, at *5 (Tex. App.—Texarkana Apr. 1, 2010, pet. denied) (mem. op.) (relying on parent's failure to visit children for six months before trial as evidence to support best interest finding). J.M.L. and J.L.B. have special

needs, and all of the children are behind in school because of their absences and because S.B. did not assist them with homework.

S.B. knew J.L. was sexually abusing J.M.L. but did not take any action. *See In re C.J.F.*, 134 S.W.3d at 354 (relying on evidence of parent's failure to protect child from abuse as evidence to support finding that termination was in child's best interest). In addition, S.B. told Cordova she had pictures of injuries J.L. inflicted on J.M.L. and E.L., but she never reported the abuse to authorities. *See id.* The children also have shared information with Claudia regarding past abuse they suffered while in S.B.'s care. *See id.* Finally, M.E.L. made an outcry about abuse J.L. inflicted on her in S.B.'s presence. *See id*

S.B. did not appear at trial and was living in Colorado in a home that was not suitable for the children. S.B. had not completed her service plan and was considering relinquishing her parental rights rather than making the efforts required to complete the service plan. *See In re S.B.*, 207 S.W.3d at 887-88 (noting failure to comply with family service plan supports a finding that termination is in the best interest of the child).

The children have been placed with Claudia for six months and are thriving in her care and making progress in school. *See In re Z.C.*, 280 S.W.3d 470, 476 (Tex. App.—Fort Worth 2009, pet. denied) (relying on evidence of children's improvement in foster care to support best interest finding). Claudia chose to become the children's foster mother because she saw how bonded the children were to each other and she did not want the children split up. The children feel safe and loved in their current placement, and Claudia plans to adopt all of the children. *See id*. (noting stability and permanence are paramount in the upbringing of a child).

Having reviewed the record, we hold the evidence is sufficient to support the trial court's finding that termination of S.B.'s parental rights was in the children's best interest.

## CONCLUSION

The order of the trial court is affirmed.

Sandee Bryan Marion, Chief Justice